IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOSIE TAYLOR, JENNIFER | § | |
| NGUYEN, and ELIZABETH COOPER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | C.A. NO. 1:10-cv-650 |
| | § | |
| SETON HEALTHCARE d/b/a/ SETON | § | |
| MEDICAL CENTER WILLIAMSON | § | |
| and JOHN BUTLER. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### I.     INTRODUCTION[1]

Josie Taylor complained to her manager in June 2008 that she was being sexually harassed

by John Butler.  Defendant did no investigation whatsoever, and Mr. Butler did not even recall being

counseled about his conduct.  Mr. Butler's harassment continued.

Josie Taylor complained again to her manager and to human resources in February 2009 that

Butler was sexually harassing her, and named other women who had told her Butler had harassed

them.  Again, no investigation took place.  Butler was told merely to stop being "discourteous" to

---

[1] Defendant Seton has filed three separate Motions for Summary Judgment, one against each Plaintiff.  Together they total 53 pages.  Defendant Butler also filed a Motion, which is ten pages.  Because there are numerous legal and factual issues common to all three Plaintiffs, Plaintiffs have consolidated their responses into this one Response. This Response is fewer pages than the combined Defendants' Motions, and would not exceed the page limitation for four separate responses pursuant to the Scheduling Order.  Counsel for both Defendants state that they are unopposed to Plaintiff filing one Response which exceeds the page limitations set forth in the Scheduling Order.  If the Court prefers four separate responses from Plaintiff, Plaintiff is willing to provide such separate responses.

employees.  He had already begun sexually harassing the other two Plaintiffs in the case, Jennifer Nguyen and Elizabeth Cooper.  His harassment continued unabated after Taylor's February 22, 2009 e-mail.  Butler's conduct consisted of the repeated and frequent touching of the Plaintiffs' breasts, buttocks, chests, and other body parts, and making lewd remarks toward them.

It was not until Ms. Taylor's April 2, 2009, complaint that Seton started investigating her reports of harassment, and got corroboration for those reports from at least three other employees. Butler received no further discipline.  Instead, the hospital's highest level manager - the President of Seton Medical Center Williamson - helped Mr. Butler get a transfer out of the hospital.  During that transfer process, Butler was instructed not to tell anyone about the harassment allegations that had been levied against him.

Defendant then began engaging in a pattern of retaliatory conduct against the Plaintiffs, eventually leading to the resignations of Plaintiffs Taylor and Cooper, and the termination of Plaintiff Nguyen.

There are clear fact issues in this case as to whether the Plaintiffs were sexually harassed and whether they were retaliated against for reporting the harassment.  As such, summary judgment should be denied.

## II.    STATEMENT OF FACTS

### A.    John Butler's Sexual Harassment of Josie Taylor

On March 14, 2008, the first day of Josie Taylor's employment at Seton, John Butler "pulled my hair to the extent that my chair rolled" and he "made lewd comments."  Taylor depo. at 39:13-19. According to Taylor, Butler "came up behind me and grabbed my ponytail and started jerking my head back and forth saying 'you like it like that, don't you?'  And I tried to pull my head forward to get away, and he pulled back and my chair rolled."  *Id.* at 42:1-7.  Taylor testified further: "Melanie

Frazier . . . was coming around the corner, and I told him to stop, and he continued.  And she told him 'Stop that, John.  It's sexual harassment.' and he bent over with his hand still on my hair and said 'Oh, am I harassing you?"  And she said, "stop it, John" again, and he let go and laughed and walked away."  *Id.* at 42:8-14.

After this incident,"Mr. Butler would touch me, try to rub my shoulders, grab my hair, and give me hugs.  He would do this not just on a daily basis, but almost every time he saw me.  I told him repeatedly to stop, but he would not."  Exh. 1 (E.E.O.C. Declaration of Josie Taylor).

As Ms. Taylor told the E.E.O.C. in her sworn Charge declaration:

> From the first day that I worked for the Respondent, John Butler, a Registered Nurse who worked on the same floor as me, began behaving toward me in a manner that made me uncomfortable.  Mr. Butler would touch me, try to rub my shoulders, grab my hair, and give me hugs.  He would do this not just on a daily basis, but almost every time he saw me.  I told him repeatedly to stop, but he would not.  Mr. Butler also said sexually-oriented things to me that made me extremely uncomfortable.  Some of his comments were:  "I should beat you with a wet noodle.  Oh no but you would like that" and "I heard all of the films they make in endoscopy are x-rated."  Mr. Butler also asked me if I had been skinny dipping in the lake next to the hospital.

Exh. 1 at 2.

**B.    Josie Taylor's June 2008 Complaint of Sexual Harassment by John Butler**

In June 2008, Ms. Taylor reported to the House Supervisor, Tom Alexander, that Mr. Butler was sexually harassing her.  Taylor depo. at 44:10-45:6.  Taylor reported the following conduct by John Butler to Mr. Alexander:

- Mr. Butler pulled Ms. Taylor's hair
- Mr. Butler ran his hand under Ms. Taylor's shirt, touching her skin
- Mr. Butler made lewd comments to Ms. Taylor, such as that he thought he had seen her skinny dipping, and that he often said "Oh, I should beat you with a wet noodle, but you'd like

that, wouldn't you?"

Taylor depo. at 44:24-45:5; 275:18-24.  Alexander testified that he did not have any reason to believe that Taylor's report was untrue.  Alexander depo. at 52:12-14.

Alexander did not "delve into" how many times Butler had touched Taylor, or whether Taylor had reported Butler's behavior to anyone else.  Alexander depo. at 34:8-35:21.  Instead, he contacted Hue Nguyen, the supervisor of the floor where they worked[2], and Tracie Thor, the senior Human Resources employee at Seton Williamson, and left messages for both of them regarding Ms. Taylor's report.  Tom Alexander depo. at 27:14-28:22.  Alexander understood at the time that the issues Taylor raised with him could have indicated a violation of Seton's sexual harassment policy; however, after he left the messages with Hue Nguyen and Tracie Thor,  neither of them ever contacted Alexander to ask him about what Taylor had reported to him.  Alexander depo. at 34:8-35:21; 41:8-12.

Ms. Taylor then met with Hue Nguyen, the floor supervisor, and told her the things that she had told Mr. Alexander.  Taylor depo. at 46:16-22.  Ms. Taylor testified that she told Ms. Nguyen that "I was not going to accept that behavior and that treatment, that my body was my own and when I told someone not to touch me that they were not to touch me."  *Id.* at 20-25.  Taylor "was repulsed and appalled by him touching me against my will after I told him not to and saying lewd things to me."  *Id.* at 47:16-18.

Hue Nguyen testified in her deposition that Taylor "said something about 'He's being playful.

---

[2]        Hue Nguyen was the Clinical Nurse Manager of the floor where the Plaintiffs and John Butler worked during the time in which the events giving rise to this lawsuit occurred.  Hue Nguyen depo. at 8:13-9:6.  As the CNM, Hue Nguyen was responsible for the daily operation of the unit, including patient safety, employee performance, physician relationship, and budget and financial issues.  *Id.* at 9:10-15.

I didn't like it.  I have to – I have asked him to stop before.'" Hue Nguyen depo. at 24:14-25:4.

Taylor, however, did not tell Nguyen that Mr. Butler was "being playful" or childish.  Exh. 39.

During their conversation, Hue Nguyen did not ask Ms. Taylor how many times Ms. Butler had

touched her.  Hue Nguyen depo. at 26:23-25.  Taylor told Hue that Butler's behavior was causing

additional stress in her life.  Hue Nguyen depo. at 28:14-19.

Following the discussion with Taylor, Hue Nguyen did not consult with anyone from HR

about whether what Ms. Taylor had reported to her might have been a violation of the Seton

harassment policy.  Hue Nguyen depo. at 32:15-24.  Tracie Thor, the senior Human Resources

employee at Seton Williamson, did not speak with Josie Taylor about her June 2008 report.  Thor

depo. at 28:2-11.  Nor did Thor conduct any investigation into Taylor's 2008 report.  Thor depo. at

22:13-23:15.  Thor claims that Hue Nguyen spoke with Taylor and Butler about the report.  Thor

depo. at 23:13-15. Thor testified that she did not know whether Taylor considered Mr. Butler's

conduct toward her that she reported in June 2008 to be intimidating, hostile, or offensive.  Thor

depo. at 3-24.

### C.    John Butler was not counseled as a result of the June 2008 report

John Butler testified during the trial on Josie Taylor's criminal charges against him that the

first time he knew of any allegation of any inappropriate behavior was in February 2009.  Butler

testified during the trial on Josie Taylor's criminal assault charge:

> Q:    I want to direct your attention specifically to this allegation in
> March of '08 [the hair-pulling].  When did you first learn of
> this complaint?
> A:    February of '09.
> Q:    Okay.  So almost a year later?
> A:    Yes.

Exh. 17 at 63:10-15.  Butler affirmed this testimony later during the trial:

5

> Q:     Okay.  And at no time from this alleged March 13th [2008]
>         date until when you found in February of '09 did she ever tell
>         you you did this to me?
> A:     No, Sir.
> Q:     And, so, you were never made aware of it by anyone?
> A:     No, sir.

*Id.* at 64:8-13.

Though Hue Nguyen testified that she counseled Butler verbally in June 2008, there is nothing in Mr. Butler's personnel file indicating that such a counseling ever occurred.  Thor depo. at 82:9-13.   Mr. Butler testified in his deposition in this lawsuit that since his testimony at the criminal trial, he had read some documents that cause him to question whether he was counseled in June 2008, but that his testimony at the criminal trial was "truthful as far as I know at the time." Butler depo. at  9:17-10:4[3].

### D.    Butler continues to harass Ms. Taylor after she complains

Butler continued to engage in the same inappropriate behavior toward Taylor after she complained to Tom Alexander and Hue Nguyen.  Exh. 1 at 2.  She testified:

> He would block my way so that I had to push past him, stand behind

---

[3] To the extent Butler's deposition testimony conflicts with his prior trial testimony, the trial testimony must be credited.  It is well established in the Fifth Circuit that a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir.1984) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980)). The Fifth Circuit has not, however, squarely addressed whether the sham affidavit doctrine applies if the sworn testimony is from a different proceeding. However, in *Essick v. Yellow Freight Sys., Inc.*, 965 F.2d 334, 335 (7th Cir.1992), the plaintiff offered  testimony while being deposed in relation to a retaliatory discharge claim in Illinois district court that conflicted with his prior testimony before the Illinois Industrial Commission in support of his worker's compensation claim. The Seventh Circuit noted that if it were to allow "a party to create a genuine issue of material fact by changing his prior testimony[,] 'the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses-would be severely undercut.' " *Essick*, 965 F.2d at 335. Following the same reasoning, this Court should not rely on John Butler's later testimony that he was counseled as a result of Ms. Taylor's June 2008 complaint.

> my chair in a threatening manner, and instead of asking me to hand
> him things, would reach over me, rub against me, and get them for
> himself.

Exh. 1 at 2.  Butler brushed up against Ms. Taylor with his hips and his "genital area."  Taylor depo.

at 155:22-156:5.   Taylor further testified that "I'm sure that at some point he probably did come in

contact with my breasts."  *Id.* at 215:15-215:20.  She further testified that "he was always brushing

up against me, coming into unnecessary physical contact with me on a daily basis in a lot of different

ways.  It was a constant thing for me to try to keep him off me."  *Id.* at 217:5-9.  Ms. Taylor further

testified that it was "possible" that Mr. Butler had touched her rear end, and that "[t]here was too

much.  There were, there were too many unwanted physical contacts for me to, for me to select just

one on that."  *Id.* at 217:12-17.  Taylor believed that Butler "touch[ed] her with sexual intent."

Taylor depo. at 245:10-12.

On February 21, 2009, Mr. Butler pinned the chair in which Ms. Taylor was sitting to her

desk with his chair, and rubbed his groin "back and forth."  Taylor depo. at  152:21-153:12.  Taylor

thought Butler was doing this in a "sexual way" because "he didn't stop when attention was brought

to it and the way he was doing it" and because "he had pinned me to the desk with my chair in order

to sit next to me and do it."  Taylor depo. at 152:5-19.  Diana Selvig was present during part of this

interaction, and told Seton (when she was interviewed approximately six weeks later) that Butler had

"invaded" Taylor's personal space.  Exh. 5.

### E.   Josie Taylor's February 22, 2009 Complaint of Sexual Harassment by John Butler

The day after the incident on which Mr. Butler pinned Ms. Taylor's chair to the desk and

rubbed his groin, Josie Taylor sent an e-mail to Hue Nguyen again reporting that Butler's harassment

of her had not stopped.  Exh. 18 at 2-3.  Taylor's purpose in sending this e-mail was "that [Butler]

7

be made to stop being inappropriate and violating the women that I worked with and myself.  My

goal was that – was to protect myself and my co-workers from him."  Taylor depo. at 232:3-7.

Taylor stated in the e-mail that "I have done everything in my power to deal with the situation I am

emailing you about and have not seen any lasting reasonable results.  I am sending you my concerns

about the completely inappropriate and offense behavior of John Butler.  I am completely repulsed

by his creepy and unwanted physical contact and aggressive speech and behavior toward myself but

also toward my co-workers."  Exh. 18 at 2.

Taylor's e-mail provided examples of Butler's inappropriate touching and comments directed

at Ms. Taylor and other employees that Ms. Taylor had witnessed.  *Id.*  Ms. Taylor concluded the e-

mail by stating that "[t]his has really gone too far for me.  He makes me feel so dirty because he is

disgusts me so much that when does relieve me for breaks I clean my work station with germicidal

wipes when I come back.  It is so exhausting to work in such a hostile work environment.  I am so

tired of this."  *Id.* at 2-3.  Taylor's e-mail identified witnesses to Mr. Butler's harassment, including

Diana Selvig, Mirna Phung, Elizabeth Cooper, Jennifer Nguyen, and asked Hue Nguyen to "please

speak with Mirna and Elizabeth, they both spoke to me about how upset they were by his

inappropriate touching and language."  *Id.*

> **F.      No investigation is conducted as a result of Taylor's February 22, 2009 e-mail, and Butler is given the lowest level of counseling, not even for sexual harassment.**

Despite Ms. Taylor's plea to Hue Nguyen that she speak with the other women Butler had

harassed, Ms. Nguyen did not do so.  Instead, she forwarded Ms. Taylor's e-mail to Tracie Thor on

February 22, 2009.  Exh. 18.  Thor then, on the next day, without conducting any investigation or

speaking with anyone, recommended that Mr. Butler be counseled for "discourteous behavior."  *Id.*

at 1.  Hue Nguyen agreed, but then took almost two weeks to counsel Mr. Butler.  Exh. 19; Hue

Nguyen depo. at 57:3-15.  Amazingly, Thor testified that she did not recall Taylor's February 22, 2009 e-mail being a complaint of sexual harassment.  Thor depo. at 34:2-8.

Tracie Thor testified that the day she received the e-mail complaint, she spoke with John Butler, but not to anyone else about the complaint, including Ms. Taylor.  Thor depo. at 49:25-50:11; 50:25-51:4.  However, Thor's own notes from the meeting call into question whether it actually took place, as, though they are dated February 23, 2009, they reference Mr. Butler having been counseled on March 6, 2009.  Exh. 20.  As such, the notes could not have been taken on February 23, 2009. *Id.*

There is no evidence that either Hue Nguyen, Tracie Thor, or anyone else interviewed Ms. Taylor or any of the witnesses identified in her complaint, or conducted any investigation whatsoever into the allegations contained in the February 22, 2009 e-mail.

The written discipline given to Mr. Butler on March 6, 2009, was the lightest level of discipline available for Seton managers (Group II).  Exh. 19, 21.  Butler was disciplined for the policy violation of "discourtesy to patients, visitors, or other employees," and not for sexual harassment.  Thor depo. at 73:14-74:15; Exh. 19.  There is a specific Seton policy that prohibits sexual harassment, and provides that it is a Group I violation, which is punishable by "discharge" or "in unusual instances, written warning, and/or suspension without pay."  Exh. 21.  However, Butler was not disciplined for sexual harassment or any Group I violation; he was disciplined only for "discourtesy," in the form of a "written warning."  Thor depo. at 74:11-15; Exh. 19, 21.

And even after she received Taylor's February 22, 2009, e-mail, Hue Nguyen failed to ensure that Butler and Taylor did not work the same shifts:

> Q:     Did you take steps between February 22nd and March 6th of
>           2009 to make sure that Josie Taylor and John Butler did not
>           work at the same time or when they might have contact with

each other?

A:      To the best of my knowledge, I have tried - I try at
        that time and I – for various reason I explain to you,
        that sometimes it just didn't work out the way it
        should be.

Hue Nguyen depo. at 59:4-11.  HR never directed or instructed that Butler and Taylor were not to

work on the same shift.  Thor depo. at 115:15-21.

### G.      Josie Taylor's April 2, 2009, Complaint of Sexual Harassment by John Butler

Butler's harassment of Taylor continued even after the February 22, 2009, e-mail.  Taylor

depo. at 150:6-13.  Between February and March 2009 and April 6, 2009,"when I [Taylor] would

sit in my seat [Butler] would reach for things over or beyond me instead of walking around the desk

so that he would brush up against me or pin me to the desk with my chair unnecessarily."  *Id.*  Butler

brushed up against Ms. Taylor with his hips and his "genital area."  *Id.* at 155:22-156:5.   Taylor

further testified that "I'm sure that at some point he probably did come in contact with my breasts."

*Id.* at 215:15-215:20.  She further testified that "he was always brushing up against me, coming into

unnecessary physical contact with me on a daily basis in a lot of different ways.  It was a constant

thing for me to try to keep him off me."  *Id.* at 217:5-9.  Ms. Taylor further testified that it was

"possible" that Mr. Butler had touched her rear end, and that "There was too much.  There were,

there were too many unwanted physical contacts for me to, for me to select just one on that."  *Id.* at

217:12-17.  Taylor was clear, however, that Butler had "touch[ed] her with sexual intent."  Taylor

depo. at 245:10-12.

Because Mr. Butler's inappropriate behavior did not stop even after the February 22, 2009,

e-mail, on April 2, 2009, Taylor again wrote to Hue Nguyen to complain of Butler's inappropriate

touching and conduct.  She wrote:

I am writing because I am being subjected to sexual harassment and

believe I am being singled out and retaliated against for the sexual harassment complaints I have already made.  As you know, I have complained twice of sexual harassment by John Butler RN.  ***My last complaint was only about a month ago, and the harassment has not stopped.  John Butler continues to touch me inappropriately and has told other employees that I have accused him of raping me.***

Exh. 23 (emphasis supplied).  Ms. Taylor went on to state:

> John has touched me inappropriately on so many occasions I cannot count them, he has done this to other female employees as well.  I am so disgusted with him that I wipe my work area down with germicidal wipes after he has been there.

*Id.*  When asked in her deposition about the April 6, 2009, complaint, Taylor testified that "I remember him brushing up against me and coming into physical contact with me every opportunity he had."  Taylor depo. at 144:5-9.  This is the same thing Taylor told Hue Nguyen when she first complained to her in June 2008.  Exh. 39.

**H.    Seton finally conducts an investigation and receives confirmation of Taylor's complaints from more than one witness.**

After receiving Ms. Taylor's April 2, 2009, complaint, Hue Nguyen interviewed several employees who had been identified in the complaint.  Exh. 4, 5, 6.  Neither Hue Nguyen nor Tracie Thor explained why they had not interviewed these individuals after they received Ms. Taylor's February 23, 2009 complaint.

When Hue Nguyen interviewed Jennifer Nguyen on April 6, 2009, Jennifer reported that she was aware of sexual harassment on the 3rd floor at Seton, and had been aware of it since August or September.  Exh. 4.  She told Hue that she had seen John Butler rubbing and massaging people's backs and grabbing people around the waist.  *Id.*  She further stated that Butler had touched her inappropriately, and that she believed that he had done so with a sexual intention.  Exh. 4.

Another employee, Mirna Phuyng, said in her statement that "John Butler hugged me once

11

when I first started working here. . . . But, I told him I did not want to be hugged anymore." Exh.

6.  Another employee, Diana Selvig, reported on April 8, 2009, that "I am aware that John Butler

does hug people inappropriately and hands out inappropriate material in the CPR class." Exh. 5.

Selvig told Hue Nguyen that "I saw uninvited physical contact such as hugging, rubbing someone's

shoulder, patting their backs from John." *Id.*  Selvig told Tracie Thor that she has told John Butler

not to hug her.  Exh. 7.  Selvig further stated that she had seen John Butler "invading Josie's space"

in the monitor room.  Exh. 5*.*

> I.     **Butler's sexual harassment of Jennifer Nguyen**

Seton's failure to act when Ms. Taylor complained in June 2008 and February 2009, allowed

John Butler to engage in sexually inappropriate behavior toward other employees, including the other

two Plaintiffs in this lawsuit, Jennifer Nguyen and Elizabeth Cooper.

Jennifer Nguyen could not recall the exact sequence of the various times Mr. Butler touched

her or otherwise made her feel uncomfortable.  Jennifer Nguyen depo. at 101:13-20.  Ms. Nguyen

testified that Butler touched her breast "numerous times" during 2008 and 2009. (Jennifer Nguyen

depo. at 156:21-22; 157:12-24).  Butler came up behind Nguyen and wrapped "his arms around my

chest" in both 2008 and 2009.  *Id.* at 158:11-159:4.  Ms. Nguyen also testified that Butler touched

her rear end in both 2008 and 2009, "coming up behind me and either rubbing off of me or grabbing

behind me."  *Id.* at 161:4-16.

Jennifer Nguyen testified that John Butler smelled her hair "numerous times," and that he

touched her hair more than three times as well.  Jennifer Nguyen depo. at 111:13-18; 112:2-6.  The

hair-pulling "would get a little rough" and caused Ms. Nguyen physical pain.  *Id.* at 153:14-22.  She

further testified that Butler "[said] sexual things toward me, [rubbed] himself in front of me,  . . .

[grabbed] my waist, [[rubbed] my shoulders" and that she told him not to do those things.  *Id.* at

116:2-5.

Ms. Ngyuen reported that she became physically ill at "the sight of seeing [Butler]" or knowing that she had to work with Butler.  Jennifer Nguyen depo. at 154:24-155:4.  She experienced "nausea, vomiting, anxiety, depression, not wanting to be there, not wanting to work" as a result of having to see Butler.  *Id.* at 155:8-13.

When Hue Nguyen interviewed Jennifer Nguyen on or around April 6, 2009, Jennifer felt "very intimidated" during the interview.  Jennifer Nguyen depo. at 37:2-7.  Hue started off the interview by saying that Jennifer's name had been mentioned as being someone who had been sexually harassed by John Butler, and that Jennifer was going through a divorce and "did not need this at this point in [your] life."  Jennifer Nguyen depo. at 37:8-20.  Hue was "very negative and loud, rude.  She – not very comforting" when she made these comments.  *Id.* at 197:7-17.  Hue's approach to Jennifer in her interview was very similar to her approach to Elizabeth Cooper during her interview, as when she told Cooper that her statements could affect her career and asking her if she was "sure" she wanted to go through with making her statement.  Elizabeth Cooper depo. at 166:5-13.

During the interview, Jennifer Nguyen "just answered her questions, and I didn't discuss or put in that paper – everything."  *Id.* at 160:3-7.  Hue Nguyen did not ask Jennifer Nguyen what parts of her body John Butler had touched, how many times Mr. Butler had touched her inappropriately, or when the inappropriate contact began.  *Id.* at 160: 2-15.  Hue Nguyen did not seem interested in hearing what Jennifer had to say about Mr. Butler during the meeting, based on her demeanor, and she was unpleasant during the meeting and expressed no sympathy either.  *Id.* at 198:20-25.  Jennifer did not review the statement that Hue Nguyen prepared before she signed it because "I was upset about the way I was being treated and I just wanted to get out of there as quickly as possible."  *Id.*

at 199:1-7.  She further testified that she had not reported the harassment earlier because she knew that Butler was doing the same thing to Ms. Taylor, and that she had complained before and that nothing had been done after her complaints.  Jennifer Nguyen depo. at 105:1-7.  Jennifer  did not report the breast-touching or hair pulling to Hue because Hue intimidated her and discouraged her from doing so by "bringing up my personal life, telling me that I didn't need this in my life right now, that these are very serious . . . allegations and she didn't know how it was going to turn out." Jennifer Nguyen depo. at 159:13-160:1.

Jennifer Nguyen's statements to Hue Nguyen that she did not take John Butler seriously and that he seemed harmless were not the truth.  Jennifer Nguyen depo. at 106:3-6.

Jennifer Nguyen's statements to Hue are corroborated by Josie Taylor, who witnessed John Butler reach and pull Jennifer Nguyen's hair to the side and smell her hair at her neck.  Taylor depo. at 229:1-6.  Taylor testified that she was "shocked" by Butler's conduct.  Taylor depo. at 233:14-15. Taylor also witnessed Butler grab Jennifer Nguyen from behind, and Nguyen struggle to get away. *Id.* at 229:1-8.  Taylor witnessed Butler grab Jennifer Nguyen from behind on more than one occasion.  *Id.* at 1-12.

### J.    Butler's sexual harassment of Elizabeth Cooper

Elizabeth Cooper testified that:

> From the first day I worked with [John] Butler, he did things that made me uncomfortable.  Every time I worked the same shift with Mr. Butler, he would touch me by putting his arm around my waist or shoulders, and would stand close to me.

Exh. 3.

The first time Elizabeth Cooper met John Butler he put his hand on her shoulder.  Cooper depo. at 43:8-14.  She told him at that time that she felt uncomfortable and didn't like that kind of

14

interaction.  *Id.* at 10-20.

On or around February 7, 2009, Butler put his hand around Cooper's waist and pulled her into a supply closet.  Cooper depo. at 45:1-9.  When Ms. Cooper asked him why he had done that, Butler replied that it was "to teach me how to do things around here."  *Id.* at 45:24-46:1.  Ms. Cooper responded that she was uncomfortable with him doing that, and asked him not to touch her like that again.  *Id.* at 46:2-5.  Cooper testified that "even after that incident, he continued to touch me whenever we worked together.  I would always tell him to stop touching me or to get off me, but he would not stop.  Exh. 3 at 2.  Butler "would also grab me by my shoulders and shake me."  *Id.*

Only a week after pulling Ms. Cooper into the supply closet, Butler did it again: Ms. Cooper was in the supply closet, and he came in and put his arms around Ms. Cooper's arms and chest from behind.  *Id.* at 46:22-47:2. Butler told Cooper "he was going to beat me with a wet noodle if I did not start doing things correctly."  *Id.* at 47:13-20.

After the second incident in the supply room, on or around February 14, 2009, Ms. Cooper called Hue Nguyen and told her about what had happened in the supply room and that she felt uncomfortable being around Mr. Butler and working with him.  *Id.* at 68:13-69:4.  Cooper testified: "I told her about the – that I felt uncomfortable working with John just because of how he would touch me, put his hand on my shoulder, hugging me, stuff like that.  That then I told her about the instances that happened in the supply closet with him holding me by my hips into the supply room and then the other instance with him putting his arms around my chest area."  Cooper depo. at 71:6-16.  Tracie Thor then called Ms. Cooper, and Ms. Cooper repeated to her the same things she had told Hue Nguyen about Mr. Butler's conduct.  Cooper depo. at 72:10-73:16.  Ms. Cooper believed that Mr. Butler's conduct in the supply closet was sexually motivated.  *Id.* at 172:1-4.

Though Cooper had asked him not to touch her, Butler continued to touch Ms. Cooper on

her shoulders "and stuff like that" until Ms. Cooper transferred to the night shift.  *Id.* at 48:24-49:4.

Ms. Cooper told the E.E.O.C.: "after my reports to [Hue] Nguyen and Ms. Thor, Mr. Butler

continued to touch me inappropriately during every shift when we worked together.  This continued

until I transferred to night shifts in approximately late March or early April 2009."  Exh. 3 at 2.

Josie Taylor witnessed John Butler hug Ms. Cooper from behind, and Ms. Cooper push him

away.  Taylor depo. at 228:8-14.

Hue Nguyen contacted Cooper in early April 2009 by phone to discuss Butler.  Cooper depo.

at 166:1-24.  Hue Nguyen began the conversation thus, as described by Cooper:

> [Hue] had mentioned that she was having to ask me these questions
> due to issues that were happening or complaints that had been made,
> and then she proceeded to tell me that – or ask me ***if I was sure I
> wanted to go through with telling her what I had said about John
> or not, because it could affect his career and possibly mine in the
> future at some point.***

Cooper depo. at 166:5-13 (emphasis supplied).  Then, though Ms. Cooper was obviously upset, Hue

proceeded to ask her questions:

> And then also she told me, she goes, 'I know you're under a lot of
> stress because of what's going on with your family life.  Will you be
> able to answer these questions?'  And I was already flustered and
> upset.  I was crying whenever she had – before she started asking me
> any of these questions.  So I was somewhat under the impression that
> if I mentioned anything in the questions that she asked me about what
> had happened in the supply closet, that I could possibly be terminated
> or something along those lines, and I was so new that I didn't want to
> lose my job.

*Id.* at 166:14-24.  Ms. Cooper responded that "I had already told my side of things, what had

happened."  *Id.* at 168:9-14.

Cooper did not recall receiving the e-mail from Hue Nguyen attaching her alleged statement.

Cooper depo. at 60:11-61:6.  Nor could Ms. Cooper recall sending the response dated April 8, 2009.

16

*Id.* at 61:21-64:23.  Nor could Ms. Cooper recall being contacted by Tracie Thor in June regarding allegations of sexual harassment, or speaking with her about such allegations.  *Id.* at 65:22-25; 66:11-20.

> **K.     After April 6, 2009, Seton begins retaliating against the Plaintiffs, and goes to great lengths to assist John Butler both financially and in finding another job at Seton.**

> **1.     Tracie Thor's May 5, 2009 e-mail**

While Tracie Thor was telling Josie Taylor on May 4, 2009, that "we are here to address your concerns and help to resolve any ongoing issues you are having," (exh. 36), the following day, she was telling Hue Nguyen and Melanie Fox to set up a meeting with Ms. Taylor with several witnesses because "that way she can not make false statements regarding what I or Hue have made."  Exh. 37 at 1-2.

At the time she wrote that e-mail on May 5, however, Thor was not aware of Ms. Taylor having made any false statements; nor did she have any reason to believe that Ms. Taylor would make any false statements.  Thor depo. at 109:20-110:2.

> **2.     HR and the President of Seton Williamson Assist John Butler in Transferring him to another position, hide the sexual harassment allegations from potential transfer sites, and place Mr. Butler on paid leave while they facilitate the transfer process.**

Despite the statements from Jennifer Nguyen, Elizabeth Cooper, Mirna Phung, and Diana Selvig, Seton never issued any further discipline to John Butler regarding his inappropriate conduct.  Thor depo. at 70:9-17; 80:2-6, 21-25; 102:4-10.  The only discipline ever issued to him was the March 6, 2009, write up for being discourteous to employees or patients.  Instead, according to Thor,

> What transpired after that fact was that he was trying to get out of the
> unit.  He wanted to go back to SPS, which is where he came from.
> He had already initiated a conversation with his previous manager
> who was trying to get a position approved and posted so that he can

17

go in there. ***And so we were trying to help facilitate that.***

*Id.* at 80:25 - 81:6.

The facilitation of Mr. Butler's transfer out of Seton Williamson was a group effort, involving everyone from Thor and Hue Nguyen to the President of Seton Williamson to Seton's head of HR. Thor depo. at 80:24-81:6; 121:20-122:22; Exh. 38, 41. They sought a position for him in a "welcoming environment" and one that would "set him up with success." Exh. 41; Thor depo. at 130:24-131:7; 132:7-17.

Mr. Butler eventually received a position at Seton's Brackridge facility, after the President of Seton Williamson reached out to the President of Brackridege on Mr. Butler's behalf. Thor depo. at 122:23-125:15. Human Resources had gotten the President involved "to see if he would use his influence to assist in making that transition happen." Thor depo. at 125:4-21. Williamson's President told Seton Brackenridge's President that "the transfer is being requested to alleviate a non-performance related situation that had arisen at [Williamson]." Exh. 42 at 1. Tracie Thor did not tell the other recruiters that Mr. Butler had been disciplined for inappropriate conduct or that sexual harassment allegations had been made against him. Thor depo. at 118:17-119:20. Cheryl Williams, Seton's Director of Human Resources, also instructed Thor to make sure that Butler not mention the sexual harassment charges when he was attempting to obtain another position within the Seton network. Exh. 38.

While these transfer attempts were taking place, Seton paid Butler and did not require him to come to work. Thor depo. at 134:2-25; 137:11-13. HR told payroll: "we have taken him off work and need to pay him for that time due to a situation [the EEOC charges] and are unsure how to handle that." Thor depo. at 135:15-136:8; Exh. 41. Butler was ultimately paid for his time off. *Id.*

**L.      Seton engages in a pattern of retaliatory conduct against all three Plaintiffs.**

The Plaintiffs in this case, however, all of whom had reported Mr. Butler's sexual harassment to Hue Nguyen and Tracie Thor, were not as fortunate as Mr. Butler to have the backing of the hospital President.  They, instead, were subjected to a series of retaliatory disciplinary actions that eventually resulted in the involuntary termination of Jennifer Nguyen and the constructive discharge of Josie Taylor[4].

Hue Nguyen received notice on May 26, 2009, that Jennifer Nguyen had filed an E.E.O.C. Charge regarding Mr. Butler's conduct.  Exh. 24.  Hue then gave Jennifer her very first disciplinary write-up for conduct that allegedly occurred on May 27, 2009, the day after Hue learned of the Charge.  Hue Nguyen did not explain why she felt the need to put this verbal counseling in writing, when she did not do so for the verbal counseling she allegedly gave to John Butler as a result of Josie Taylor's June 2008 complaint.

Less than a month later, Hue Nguyen documented another "Verbal Coaching" for Jennifer for attendance, though she did not state that Ms. Nguyen had violated any Seton policy in the Coaching, or that she had even engaged in misconduct.  Again, Hue did not explain why she felt the need to document this "verbal coaching" for Jennifer, when she did not document the one she allegedly gave to Butler.

In December 2009, Hue wrote Jennifer up for "insubordination," for changing shifts with another employee.  Exh. 27.  However, there is no evidence that Jennifer was insubordinate - she is not accused of any behavior directly contrary to a directive or otherwise contrary to any supervisor's

---

[4]  Elizabeth Cooper agrees that she was not constructively discharged by Seton.  As such, Plaintiff is unopposed to this Court granting Seton's Motion for Summary Judgment regarding Cooper's constructive discharge claim.

instruction.  Exh. 27.

Finally, Jennifer Nguyen was terminated on March 4, 2010, for conduct that allegedly occurred on February 22, 2010.  Exh. 28.  Jennifer was accused of charting vital signs that she had not taken.  *Id.*  Of course, Seton could not prove that Jennifer had not taken the vitals, and relied, in deciding to terminate her, on the fact that vital signs had not been taken on the "monitor" in the patient's room, but had been charted there.  Exh. 28.  However, as Jennifer testified, "vital signs can be taken in a number of ways.  You can take them manually, you can take them on a roll-away machine, you can take them on the monitors in the room."  Nguyen depo. at 87:19-24.  By the time Jennifer was presented with the termination notice, ten days after the alleged misconduct, there was no way for her to remember how she had taken the vitals on the patient she was alleged to have falsified records on, and she knew nothing about the patient.  *Id.* at 89:17-25; Exh. 40.  It is significant that Seton allowed Jennifer to work and treat patients unsupervised between February 22, 2010, when it learned of her alleged falsification of medical records, all the way through March 4, 2010, when it terminated her.  Seton did not place Ms. Nguyen on any administrative leave or leave without pay while it supposedly investigated her misconduct that, if proven, could have affected patient safety and health.

Josie Taylor similarly received her first written discipline shortly after complaining of John Butler's harassment to Hue Nguyen.  Taylor complained on February 22, 2009, and was written up just over a month later, on April 1, 2009, for allegedly using a curse work in front of a new employee.  Exh. 29.  Hue Nguyen, who wrote Ms. Taylor up, did not explain why she felt it necessary to document this verbal counseling with a write-up, but did not do the same when she allegedly counseled John Butler in June 2008 for inappropriately touching Ms. Taylor.

Ms. Taylor received another written disciplinary notice on October 2, 2009, again for alleged

misconduct that could not be proven or substantiated.  Exh. 30.  As Hue Nguyen testified, there

would be no way to go back and pull the telemetry strips that Ms. Taylor was accused of not properly

monitoring.  Hue Nguyen depo. at 167:21-168:22.  Hue also testified that she did not keep copies

of the telemetry records, and that, conveniently, the incident had been reported to her too long after

the fact for her to have kept those records.  *Id.*    The other alleged violation referenced on the

October 2, 2009, write up was for an alleged HIPAA violation committed by Ms. Taylor by allowing

a non-employee to view the telemetry screens.  Exh. 30.  However, Hue Nguyen, who disciplined

Ms. Taylor, never reported this incident to the HIPAA officer at Seton; nor did she know whether

it had been reported by HR to the HIPAA officer (which it had been).  Hue Nguyen depo. at 172:19-

173:4; 183:6-23.  As Ms. Taylor stated in her rebuttal to this discipline: "I have not been given any

opportunity to tell the truth of these situations before being written up.  These events did not happen

as they are said to in this written counseling and I was never questioned prior to being presented with

these documents."  Exh. 30.  Ms. Taylor resigned her employment with Seton on October 19, 2009,

because of the pattern of discipline she received from Hue Nguyen.  Josie Taylor depo. at 205:10-17.

## III.    ARGUMENT

### A.    A genuine issue of material fact exists as to whether Cooper, Taylor, and Jennifer Nguyen were subjected to a sexually hostile work environment.

To establish the elements of a hostile work environment claim, the plaintiff must show:(1)

she belongs to a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the

harassment was based on sex, (4) the harassment affected a term, condition, or privilege of

employment, and (5) the employer knew or should have known of the harassment and failed to take

remedial action.  *Green v. Adm'rs of the Tulane Educ. Fund,* 284 F.3d 642, 655 (5th Cir.2002).  The

Fifth Circuit has recognized, in light of the Supreme Court's holdings in *Burlington Indus., Inc. v.*

*Ellerth,* 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), that in circumstances where the alleged harasser is a supervisor with authority over the employee, as in this case, only the first four elements need be satisfied. *See Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999); *Mire v. Texas Plumbing Supply Co., Inc.*, 286 Fed.Appx. 138, 140, 2008 WL 2704573, 2 (5th Cir. 2008).

Seton challenges elements four and five for all Plaintiffs.

### 1.    Element Four: the harassment of Plaintiffs affected a term, condition, or privilege of their employment.

To affect a term, condition, or privilege of employment, the harassing conduct " 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment' ". *Aryain v. Wal-Mart Stores of Tex., LP,* 534 F.3d 473, 479 (5th Cir.2008) (quoting *Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so". *Id.* at 479. (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275).

The test-whether the harassment is severe or pervasive-is stated in the disjunctive. *Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. *Id.* (*citing Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 434-35 (5th Cir.2005)). The inverse is also true: frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists.  *Id.* Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with

the pervasiveness or frequency of the conduct." *Id.* (*citing Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991).

In evaluating such claims, courts focus on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance.' " *Id.* at 655-56 (quoting *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996)); *Mire v. Texas Plumbing Supply Co., Inc.*, 286 Fed.Appx. 138, 141, 2008 WL 2704573, 3 (5th Cir. 2008).

The harassment of all three Plaintiffs meets this standard.

**Josie Taylor.**   As detailed in the Statement of Facts above, he very first day Taylor worked with Butler, he grabbed hair, jerked it back and forth, and said "you like it like that, don't you." After that, he touched Taylor, tried to rub her shoulders, grab her hair, and give her hugs almost every time he saw her.  Butler also ran his hand under Taylor's shirt and touched her skin.  Taylor told Butler repeatedly to stop, but he would not.

Butler directed sexually oriented comments at Taylor, including asking her if she had been skinny dipping in the lake next to the hospital, and saying to her "I should beat you with a wet noodle - oh but you would like that."  While the defendant asks the Court to take judicial notice of columnist Ann Landers fondness for the expression "lashes with a wet noodle," (Def. Motion (Taylor) at 11 &n.4), Ms. Landers' use of the phrase was unencumbered by the clearly sexual and sado-masochistic overtones with which Mr. Butler's "oh but you would like that" imbues it.

In addition to the conduct described above, Butler blocked Taylor's way so that she had to push past him, stood behind her in a threatening manner, and instead of asking her to hand him things, would reach over Taylor, rub against her, and get them for himself.

On February 21, 2009, Mr. Butler pinned the chair in which Ms. Taylor was sitting to her

23

desk with his chair, and rubbed his groin "back and forth."   Butler brushed up against Ms. Taylor

with his hips and his "genital area."   Taylor testified that "I'm sure that at some point he probably

did come in contact with my breasts."   *Id.* at 215:15-215:20.   She further testified that "he was

always brushing up against me, coming into unnecessary physical contact with me on a daily basis

in a lot of different ways.   It was a constant thing for me to try to keep him off me."   *Id.* at 217:5-9.

Ms. Taylor further testified that it was "possible" that Mr. Butler had touched her rear end, and that

"There was too much.   There were, there were too many unwanted physical contacts for me to, for

me to select just one on that."   *Id.* at 217:12-17.   Taylor believed that Butler "touch[ed] her with

sexual intent."   Taylor depo. at 245:10-12.

**Jennifer Nguyen.**      Jennifer Nguyen testified that Butler touched her breast "numerous

times" during 2008 and 2009. Butler came up behind Nguyen and wrapped "his arms around my

chest"  in both 2008 and 2009.   Ms. Nguyen also testified that Butler touched her rear end in both

2008 and 2009, "coming up behind me and either rubbing off of me or grabbing behind me."   *Id.* at

161:4-16.

John Butler smelled Jennifer Nguyen's hair "numerous times," and touched her hair more

than three times as well.   The hair-pulling "would get a little rough" and caused Ms. Nguyen physical

pain.  *Id.* at 153:14-22.  Butler said sexual things to Nguyen, rubbed himself in front of her, grabbed

her waist, and rubbed her shoulders, though she told him not to.

Ms. Ngyuen reported that she became physically ill at "the sight of seeing [Butler]" or

knowing that she had to work with Butler.  Jennifer Nguyen depo. at 154:24-155:4.  She experienced

"nausea, vomiting, anxiety, depression, not wanting to be there, not wanting to work" as a result of

having to see Butler.  *Id.* at 155:8-13.

**Elizabeth Cooper.**      From the first day Elizabeth Cooper worked with Butler, he did things

that made her uncomfortable - touching her by putting his arm around her waist or shoulders, and would stand close to her.  Cooper told Butler she did not want him to do those things, but he continued to do them anyway.

Both of the incidents in the supply closet were severe and threatening, particularly the second one, in which Butler physically restrained Cooper by putting his arms around her arms and chest from behind.  Butler continued to touch Cooper inappropriately until she transferred to another shift in or around April 2009.

In all three cases, the plaintiffs testified to harassment that occurred on a "daily" basis, or every time they worked with Butler.  Butler's constant touching of the Plaintiffs, particularly on their breasts and rear ends, but also on other parts of their bodies, was pervasive and sexually offensive to all three women.   Butler's conduct clearly interfered with the all three Plaintiffs' work performance.  Not only did Mr. Butler physically prevent them from performing their job duties, all three testified to the effects Butler's conduct had on them: intimidated, as Ms. Cooper was when he assaulted her in the supply closet; disgusted, as both Taylor and Nguyen were (Taylor wiping down her workstation with germicidal wipes after Butler visited, Nguyen testifying to feeling physically ill at the thought of working with Butler), and physically ill, as Taylor and Nguyen became.

The harassment in this case is severe or pervasive under Fifth Circuit precedent.  It is worse than the harassment found in *McKinnis v. Crescent Guardian, Inc.*, 189 Fed.Appx. 307, 308, 2006 WL 1880364, 1 (5th Cir. 2006), where the plaintiff testified that the harasser "was harrassing [sic] me; he kept coming in the post where I was; asking me for hugs and kisses; and touching me and stuff." This touching included, according to McKinnis, "one time he touched me on my breast; and then on my thigh."

Based on this evidence alone, the *McKinnis* Court reversed summary judgment for the

defendant, reasoning that "[u]ndoubtedly, the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment." *Id.* The *McKinnis* court further held that a plaintiff's "assertions that she was touched 'numerous times' instead of providing exact dates or the exact number of instances do not render her allegations so conclusory that they fail to create a genuine issue of material fact." *Id.* (*citing Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 436 (5th Cir.2005)).

Other Fifth Circuit cases are similarly on point. In *Taylor-Rogers v. Robb & Stucky, Ltd.,* 82 Fed.Appx. 974, 975 (5th Cir.2003), the court found that evidence that a co-employee, among other things, rubbed up against plaintiff on a daily basis and had simulated a sex act with her was "sufficient to create a genuine issue of material fact as to the severity and pervasiveness of the harassment." *Id.*

Defendant seeks to rely on the *Hockman* and *Shepherd* decisions to defeat Plaintiffs' "severe or pervasive" element. However, the harassment in *Hockman* was not as pervasive as the harassment alleged in this case. In *Hockman,* the Fifth Circuit upheld summary judgment for the employer when the plaintiff alleged that, "over the course of a year and a half, a male co-worker: '(1) ... once made a remark to [plaintiff] about another employee's body, (2) ... once slapped her on the behind with a newspaper, (3) ... "grabbed or brushed" against [her] breasts and behind, (4) ... once held her cheeks and tried to kiss her, (5) ... asked [her] to come to the office early so that they could be alone, and (6) ... once stood in the door of the bathroom while she was washing her hands.'" *Donaldson v. CDB Inc.,* 335 Fed.Appx. 494, 503, 2009 WL 1916466, 9 (5th Cir. 2009)(*quoting Hockman,* 407 F.3d at 328). Here, in contrast, Mr. Butler touched the Plaintiffs' breasts and buttocks, put his arms around them, touched their hair and other parts of their bodies, and made lewd and suggestive comments to them.

Likewise, the harassment in *Shepherd v. Comptroller of Public Accounts,* 168 F.3d 871 (5th Cir.1999) was also not as pervasive as that in this case.  In *Shepherd*, the Fifth Circuit upheld summary judgment for the employer on a hostile-work-environment claim

> when, over a two-year period, the plaintiff alleged her male co-worker: once stood at her desk and remarked "your elbows are the same color as your nipples"; once said "you have big thighs" while simulating looking under her dress; stood over her desk on several occasions and attempted to look down her clothing; touched her arm and rubbed her shoulder on several occasions; and, on two occasions, patted his lap and said "here's your seat", after she arrived late for an office meeting. *Id.* at 872. The plaintiff affirmed that, beyond these allegations, she had a friendly relationship with the co-worker both at, and outside of, work. (The plaintiff was engaged to the co-worker's brother-in-law.)

*Donaldson*, 335 Fed.Appx. at 504 (quoting *Shepherd*, 168 F.3d 862).   Unlike this case, *Shepherd* involved only a few instances of touching, all on the plaintiff's arm and shoulder.

Cases from other circuits also establish that the severity or pervasiveness standard is clearly met in this case.  For example, in *EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 508-09 (6th Cir.2001) the court held that the fact that jury could find that supervisor's daily attempt to get close to employee and touching him whenever they were talking, stalking employee two or three times a day after employee was transferred, and grabbing employee's private parts constitutes severe, physically threatening, and humiliating discriminatory conduct.   Similarly, in *Johnson v. Booker T. Washington Broadcasting Servs., Inc.* 234 F.3d 501 (11th Cir.2000), the court held that fifteen incidents within a four-month period, which included unwanted massages, standing close enough for the harasser's body parts to touch the plaintiff's, and the harasser's pulling his pants tight to reveal his body parts, were sufficiently severe or pervasive for a jury to conclude that they fell within the definition of actionable harassment.  *See also Spivey v. Akstein*, 2005 WL 3592065, 14 (N.D.Ga.,2005)(plaintiff was employed for almost two years with only one incident elevating to the

severity of the touching incident. Nonetheless, the court noted that, even if the touching incident itself were not severe or pervasive enough to alter the terms, conditions, or privileges of the plaintiff's employment, the plaintiff has alleged a pattern of less severe physical conduct, including frequent hugs and kisses, that, viewed in its entirety and in the light most favorable to plaintiff, could be sufficiently severe or pervasive); *Dar Dar v. Associated Outdoor Club, Inc.*, 201 Fed.Appx. 718, 2006 WL 3006704 (11th Cir. 2006)(holding that just two sexual comments (asking Plaintiff whether she had ever seen "built-in butt" depicted in magazine ad, and commenting, in front of Plaintiff, on other individual's "whale of a dick") combined with repeated touching Plaintiff were sufficiently severe and pervasive); *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 475 (5th Cir. 2002)(affirming jury's hostile environment verdict based on evidence of "repeated inappropriate touching, vulgar comments, propositioning, and physical aggression."

 Other courts have held that the specific types of contact at issue in this case can amount to severe or pervasive harassment.  For hugging, *see Ryan v. Veneman*, 2006 WL 335885, 7 (S.D.Miss.) (S.D.Miss.,2006).  For hugging and rubbing shoulders, *see  Bryars v. Kirby's Spectrum Collision, Inc.*2009 WL 1286006 (S.D.Ala.,2009);  *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 600 (2nd Cir. 2006)(harasser approached Schiano from behind while she was working, leaned into her, and placed his hands on her back, neck, and shoulders (severe or pervasive in combination with other conduct, such as lewd comments)).  For pushing body into employee and hugging, *see Schmidt v. Medicalodges, Inc.*, 492 F.Supp.2d 1302 (D.Kan.,2007).

 To determine whether conduct is severe or pervasive, the Court must look to the totality of the circumstances. *Lauderdale,* 512 F.3d at 163.  Here, given the frequency of Butler's touching of the plaintiffs, his continuing to touch them after they asked him to stop and complained to management, his lewd remarks, and the emotional and physical effects on the Plaintiffs, the totality

of the circumstances would allow a reasonable jury to conclude that Butler's harassment was severe or pervasive.  As such, summary judgment should be denied.

> ### 2.    Fifth Element:  Seton knew or should have known of the harassment and failed to take prompt remedial action.

There are two reasons the Plaintiffs prevail on the fifth element of their sexual harassment claim: (1) John Butler had supervisory authority over them, and therefore the fifth element need not be considered and (2) Seton knew about John Butler's harassing conduct and took no action to cause it to stop.

An employer may be held responsible for a hostile work environment "if it knew or should have known of the harassment and failed to take prompt remedial action." *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir.1993) (citing *Jones,* 793 F.2d at 720); *see Burlington Indus.,* 118 S.Ct. at 2267 ("An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII.").

A plaintiff may establish an employer's knowledge by demonstrating either actual or constructive notice to the employer. *See Sharp v. City of Houston,* No. 97-20602, 1999 WL 10153, at *4 (5th Cir. Jan. 12, 1999); *Williamson v. City of Houston,* 148 F.3d 462, 465 (5th Cir.1998); *Waltman v. International Paper Co.,* 875 F.2d 468, 478 (5th Cir.1989). Actual notice can be proven by evidence that the plaintiff complained to someone in management with the authority to take remedial action, *see Sharp,* 1999 WL 10153, at *4-*5; *Waltman,* 875 F.2d at 478, whereas constructive notice is demonstrated by showing that the harassment was sufficiently pervasive to give "rise to the inference of knowledge or constructive knowledge" on the part of someone with remedial authority, *Waltman.* 875 F.2d at 478 (internal quotation marks omitted); *see Sharp,* 1999

WL 10153, at *5.

In this case, Josie Taylor complained of Mr. Butler's inappropriate touching in June 2008. There is conflicting evidence as to whether Butler was ever notified of the complaint, or whether he was instructed to cease harassing Ms. Taylor at that time. Construing all of the facts in favor of the Plaintiffs in this case, the evidence is that Mr. Butler was not counseled or spoken to about the complaint.

That complaint, however was sufficient to put Seton on notice of his inappropriate conduct, thereby establishing that "the plaintiff complained to someone in management with the authority to take remedial action." Hue Nguyen and Tracie Thor's failure to take any action in response to that complaint made it possible for Butler to continue to harass not only Ms. Taylor, but also Ms. Cooper and Ms. Nguyen, with no threat of discipline or counseling.

Taylor reported Mr. Butler's inappropriate conduct again on February 22, 2009, and specifically named Ms. Cooper and Ms. Nguyen in her report. No one spoke with either Cooper or Nguyen for *six weeks* after that report, during which time Mr. Butler continued to harass all three. Given both of these reports, along with Cooper's report to Hue Nguyen and Tracie Thor in mid-February about the supply closet incidents, and Jennifer Nguyen's confirmation in her April 6, 2009, interview with Hue Nguyen, there is no way that Seton can credibly claim that it had no knowledge of Butler's harassing conduct.

Seton's failure to take prompt remedial action is highlighted by the facts that (1) no one said anything to Butler after Ms. Taylor's June 2008 complaint; (2) Seton conducted no investigation into Ms. Taylor's June 2008 complaint; (3) Seton did no investigation into Taylor's February 22, 2009 complaint until April 6, 2009; (4) when Butler was finally disciplined as a result of the reports of sexual harassment, it was only for "discourtesy to employees or patients," and not for a violation of

Seton's sexual harassment policy; (5) when Seton learned the full extent of Butler's harassment of all three Plaintiffs after the "discourtesy" discipline was issued, it took no further action to counsel or discipline Butler; and (6) Seton HR and upper level management actively took steps to conceal the harassment allegations against Butler when they assisted him in finding a position outside of Seton Williamson.

Seton contends that there is no issue of fact as to whether it took prompt remedial action because Seton "counseled Butler and scheduled his shifts to minimize interactions with Taylor." Def. Motion (Taylor) at 12.  Clearly, that was not enough, as Butler took the opportunity to continue harassing Taylor.  Further, Hue Nguyen's testimony was clear that she did not succeed in scheduling Butler and Taylor so that they could not interact.  The *Skidmore* court found that the plaintiff failed to establish the fifth element because, as Seton puts it in its Motion, "the employer instructed the alleged harasser to stop engaging in the behavior and moved him to a different shift, and the plaintiff never registered a further complaint."  Def. Motion (Taylor) at 12.  Here, while Butler was instructed, eight months after Taylor's first complaint, to stop his harassment, Seton concedes that it did not move Butler to another shift, and received further complaints about Butler after the June 2008 *and* February 2009 complaints.  This conduct does not satisfy the *Skidmore* standard for corrective action, and requires the denial of Seton's Motion.

Given all of these circumstances together, a reasonable jury could find that Seton was put on notice of John Butler's sexually inappropriate behavior beginning in June 2008, and failed to take prompt remedial action even after Ms. Taylor's second complaint, allowing the sexual harassment to continue long after Seton knew or should have known of Butler's behavior.

The Plaintiffs also meet the fifth element of their claim because Butler was a supervisor on the floor where they worked.  The Fifth Circuit has recognized that, following the Supreme Court's

holdings in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), only the first four elements need to be satisfied when the alleged harasser had supervisory authority over the employee. *See Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999).

In this case, Butler was the Charge Nurse when he harassed the Plaintiffs.  As the Charge Nurse, Butler's responsibility was to "oversee the floor," "to make sure that the assignments are equitable between the different registered nurses and clinical assistants," and to "intervene if there's any form of a concern or potential crisis."  Tom Alexander depo. at 49:7-17.  The Charge Nurse "is a resource person for the other nurses to come to" and to serve as a "mentor."  *Id.* at 18-25.  These duties qualified Butler as the supervisor of the Clinical Assistants, including the Plaintiffs in this case.

Whether harassment was severe or pervasive is a question of fact.  *Harper v. City of Jackson Municipal School Dist.*, 149 Fed.Appx. 295, 299, 2005 WL 2404813, 3 (5th Cir. 2005)("[w]e agree that Harper's allegations create an issue of fact on whether the harassment rose to the "severe or pervasive" level). In this case, a reasonable jury could resolve that question in the affirmative - that Butler's harassing conduct was severe or pervasive, or both.  As such, summary judgment should be denied regarding the Plaintiffs' sexual harassment claims.

### B.    Plaintiffs Taylor and Nguyen were subjected to unlawful retaliation

The elements of a *prima facie* retaliation claim are that the plaintiff engaged in protected conduct, that she subsequently suffered an adverse employment action, and that the adverse employment action was taken in response to her protected conduct. *Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 330 (5th Cir.2004) (citing *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167 (5th Cir.1999)). In *Burlington Northern & Santa Fe Ry. Co. v. White,*

548 U.S. 53, 126 S.Ct. 2405, 2414 (2006), the Supreme Court held that the antiretaliation provision of Title VII is not limited to ultimate employment actions. The provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Courts in this circuit have routinely held that disciplinary write-ups constitute adverse employment actions actionable under Title VII. *See, e.g., Holden v. Illinois Tool Works, Inc.*, 2008 WL 183334, 10 (S.D.Tex.,2008)("Holden has raised a fact issue as to whether she received unwarranted disciplinary write-ups in retaliation for filing her EEOC charge.")

As the Supreme Court noted in *Burlington,* "the significance of an alleged act of retaliation depends upon the particular circumstances of the individual employee. Context matters." *Burlington,* 126 S.Ct. at 2414.  Here, the retaliatory nature of the write-ups is clear not only from the temporal proximity to the Plaintiffs' protected conduct (Taylor receiving her first write up five weeks after her February 22, 2009 e-mail, and Nguyen receiving hers for conduct occurring the day after Hue Nguyen learned of her E.E.O.C. Charge), but also from Seton's more favorable treatment of Butler. Seton went out of its way not only to be nice to Butler, but to assist him, through the highest levels of management, in obtaining a new position outside of Seton Williamson.  The fact that Seton Williamson's HR and upper management purposefully hid the harassment allegations during the transfer process would also allow a reasonable jury to find that the pattern of discipline against Taylor and Jennifer Nguyen was done in retaliation for their allegations of harassment.

Seton contends that Ms. Taylor cannot establish a causal connection between her complaints and the discipline she received.  Def. Motion for Summary Judgment (Taylor at 14).  However, Seton's timeline ignores the fact that Ms. Taylor had never received any discipline whatsoever until the April 1, 2009, write-up, which came only five weeks after her February 22, 2009 complaint to Hue.

Courts frequently look at the temporal proximity between the adverse action and the notice for circumstantial evidence of retaliatory motive. *Burfield v. Brown, Moore & Flint,* 51 F.3d 583, 590 (5th Cir.1995).  Six weeks is "within the time frame that, pursuant to Fifth Circuit precedent, may evidence a causal relationship between" protected activity and adverse action.  *Hornak v. Enterprise Products Co., Inc.*, 2010 WL 3490192, 4 (S.D.Tex.,2010).  Temporal proximity between the protected conduct and the adverse action will satisfy the causal connection for purpose of the *prima facie* case of retaliation. *Carrera v. Commercial Coating Services Intern., Limited*, 422 Fed.Appx. 334, 340, 2011 WL 1439918, 4 (5th Cir. 2011).

Both Taylor and Nguyen were first disciplined very soon after their reports of sexual harassment.  As such, both can establish a *prima facie* case of retaliation for their being disciplined for reporting sexual harassment by John Butler.

In response, Seton must produce evidence of a legitimate, non-retaliatory reason for the discipline.  Seton appears to contends that those reasons are stated on the faces of the write-ups.  Def. Motion (Taylor) at 15; Def. Motion (Nguyen) at 6-7.

The burden then shifts to the Plaintiffs to show that the articulated reasons are a pretext for unlawful retaliation.  Pretext can be shown by " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Parker v. Pulte Homes of Texas, L.P.*, 2011 WL 767182, 7 (S.D.Tex.,2011).

Here, there are numerous factors that show such "weakness and implausibilities" in the disciplines given to Taylor and Nguyen.  The temporal proximity is the first such factor.  *Burfield* 51 F.3d at 590.  Second is the fact that all of the disciplinary notices given to Taylor and Nguyen

were based on hearsay from other employees, and not substantiated by any documentation. For example, the telemetry strips for the "blue screen" discipline given to Ms. Taylor have all disappeared, and were not attached to the disciplinary notice, or included in Ms. Taylor's file. The alleged HIPAA violation created by Ms. Taylor allowing a former employee to sit in the telemetry room with her was not even severe enough for Hue Nguyen to report it to Seton's HIPAA officer, and there is no evidence that Ms. Taylor's act did actually constitute a HIPAA violation.

Ms. Taylor's write-up for saying a curse word on the floor is inconsistent with Seton's (and Hue Nguyen's specifically) policy of giving an undocumented oral discipline to employees (such as John Butler) on their first "discourtesy" event. Hue Nguyen's decision to issue a written counseling to Taylor for cursing, but to simply orally discipline John Butler after Taylor's June 8 report (which Hue took to be a report of discourtesy) is unexplained in the record, and would well support a jury's finding that the pattern of discipline initiated with the cursing write up was a pretext for retaliation.

Hue Nguyen and Tracie Thor's pattern of looking for things to write Taylor up for, and being unsuccessful at that search also shows pretext. *See* §III(D), *infra*. Setting up a meeting with witnesses to prevent Ms. Taylor from making false statements later on, though they had no evidence that she had ever lied before, is further evidence that Nguyen and Thor were motivated to retaliate against the Plaintiffs. *See* Exh. 37.

Seton's clearly favorable treatment of Mr. Butler is another factor. Hue Nguyen and Tracie Thor did little or no investigation into the harassment allegations against Mr. Butler for ten months after the first report, and, even after the second report, only disciplined Mr. Butler for "discourtesy," at the lightest level of discipline possible (Group II). Then, when they discovered that other employees, including Jennifer Nguyen, Diana Selvig, and Mirna Phung, had either witnessed or been subjected to treatment similar to that reported by Josie Taylor, instead of attempting to correct Mr.

35

Butler's behavior or discipline him further, they facilitated a transfer for him, in what a reasonable jury could surely see as avoiding the problem rather than addressing it.

Given the foregoing, a reasonable jury could find that Hue Nguyen's pattern of disciplining both Jennifer Nguyen and Josie Taylor was retaliation for their complaints of sexual harassment by John Butler.

### C. A reasonable jury could find that Jennifer Nguyen was terminated in retaliation for complaining of sexual harassment.

The same *prima facie* case standards apply to Jennifer Nguyen's termination claim. She engaged in protected activity (filing an E.E.O.C. Charge), and was subjected to an adverse action (termination). The causal link here is established first by the temporal proximity between her complaint and the first discipline in the pattern of disciplinary notices she received. *See Marx v. Schnuck Mkts. Inc.*, 76 F.3d 324, 329 (10th Cir.1996) (holding that the close temporal proximity requirement should not be read too restrictively where a pattern of discrimination begins soon after protected activity and only culminates later in actual discharge); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir.2005)(noting that "background evidence" of adverse employment actions can show chain of events leading to discharge and so establish temporal proximity). Thus, the six months between Ms. Nguyen's protected conduct and her termination is not too large of a gap in time for temporal proximity to be found. The causal connection is also established by the fact that Jennifer Nguyen was terminated for actions she was not asked or permitted to explain, that there was no evidence that she had done, and that she was permitted to work from February 22, 2010 through March 4, 2010, without any additional supervision or anyone checking on her work.

Ms. Nguyen was terminated for allegedly falsifying medical records of a patient by charting

36

vital signs she had not taken.  Had Seton truly been concerned that Ms. Nguyen was endangering the lives of its patients by falsifying their records and not taking their vital signs, surely they would not have permitted her to work unsupervised as they did, from February 22, 2010, through March 4, 2010.  In addition, the misconduct of which Ms. Nguyen was accused is inherently unprovable: she was accused of not taking vital signs, but was not given a chance to explain or show that she had. As Ms. Nguyen states in her declaration attached hereto, there are any number of means that she could have used to take vital signs that are not recorded on the computer, and frequently used such means on Seton patients.  Exh. 40.  Conveniently, however, there are no records to show when those other machines are being used.  Hue Nguyen depo. at 162:5-22.

By the time Jennifer Nguyen was terminated, she was the last of the three Plaintiffs to be working at Seton.  Elizabeth Cooper and Josie Taylor had already quit.  Given the clear favoritism for John Butler over the three Plaintiffs demonstrated by Hue Nguyen, Tracie Thor, and the other management staff who assisted Butler in transferring and hiding the harassment accusations, a reasonable jury could conclude that there was a causal connection between Jennifer Nguyen's complaints about Mr. Butler and her termination.  Given the foregoing regarding the inconsistencies and incoherencies in the reason for Jennifer Nguyen's termination, and primarily the fact that there is no actual evidence that Ms. Nguyen falsified medical records, a jury could find that the reason given for her termination was pretextual.  As such, summary judgment should be denied.

**D.** **A reasonable jury could find that Josie Taylor was constructively terminated in retaliation for complaining of sexual harassment.**

To prove constructive discharge, a party must show that "a reasonable party in his shoes would have felt compelled to resign." *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998). To determine if a reasonable employee would feel compelled to resign, courts consider

the relevancy of the following events: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir.2001); *Dediol v. Best Chevrolet, Inc.*, 2011 WL 4011079 (5th Cir., September 12, 2011).

Here, the pattern of conduct, including the unsupported disciplinary notices, failure to address Ms. Taylor's complaints of harassment, and Hue Nguyen's continuous search for potential disciplinary issues for Ms. Taylor constitute badgering harassment and humiliation calculated to lead to Ms. Taylor's resignation. *Id.*; *Gold Coast Restaurant Corp. v. N.L.R.B.*, 995 F.2d 257, 266, 301 U.S.App.D.C. 357, 366 (C.A.D.C.,1993)(finding that existence of disparate discipline will support claim for constructive discharge).

As Ms. Taylor stated in her resignation letter, "I submit this in response to the hostile and retaliatory environment that's been created since my complaint of sexual harassment and the assaults upon me by John Butler." Exh. 31.

Not only was Ms. Taylor given the unjustified formal written disciplinary notices discussed above after her complaints, but Hue Nguyen and Tracie Thor spent a substantial amount of time searching for reasons to discipline Ms. Taylor that ultimately failed because they could not get the support they needed for such reasons. For example, Hue Nguyen wrote an "anecdote" sometime after April 1, 2009, regarding tardiness (for which Ms. Taylor was not disciplined) that occurred as early as January 4, 18, and 29. Exh. 32. Hue Nguyen wrote another "anecdote" about alleged misconduct by Ms. Taylor during the week of April 29, 2009, but could not turn that anecdote into a disciplinary action because "since time has elapsed the manager chose not to approach Josie but

continue to monitor and will address with Josie should similar event arises."  Exh. 33.  On or around

August 31, 2009, Hue again tried to write Josie up for a HIPAA violation, but could not because,

according to Tracie Thor, "I just spoke with [the HIPAA officer] and given that JT [Josie Taylor]

did not share the patient's information nor the RN's name she was referring to this would not be a

HIPAA violation.  That said, I still have concerns around code of conduct and have asked legal for

advice on how to approach that."  Exh. 34 at 1-2.  And Exhibit 35 reflects that in October 2009, Hue

had asked another employee, Karen Schmidt, "to write a memo to her regarding an incident with

Josie Taylor", also for which Ms. Taylor was ultimately not written up.  Exh. 35.

　　　　Ms. Taylor testified in her deposition that the reason she resigned from Seton was:

> . . . it was just constant animosity. . . I felt as though I was always
> under the microscope, and, you know, I had been so humiliated by
> Hue . . .

Josie Taylor depo. at 205:10-17.  The animosity Ms. Taylor felt was real - it is reflected not only in

the baseless disciplinary notices that she was issued, but also in her day to day interactions with Hue

Nguyen. The fact that, as demonstrated by Exhibits 32-35, Hue was clearly looking for dirt on Ms.

Taylor for which she could write her up would allow a reasonable jury to conclude that Ms. Taylor's

feeling of "constant animosity," being "under the microscope" and "humiliated" by Hue were real

and justified.  As such, that jury could also find that no reasonable person would have remained in

Ms. Taylor's position.  Summary judgment on her constructive discharge claim is thus improper.

### E.　　A reasonable jury could find that Seton is vicariously liable for Butler's assaults on the Plaintiffs.

　　　　As discussed *infra*, each of the Plaintiffs has a viable claim that she was assaulted by John

Butler.  Those assaults all happened while the Plaintiffs were at work, attempting to perform their

job duties.

The key issue in determining whether an employer has authorized the acts of its agent is the employer's knowledge of the acts and the employer's actions in light of that knowledge. *Paramount Nat. Life Ins. Co. v. Williams*, 772 S.W.2d. 255, 267 (Tex. Ap.—Houston [14th Dist.] 1989]). When an employer "1) knows about an employee's acts, 2) recognizes that the employee's acts will continue if he is retained, 3) does nothing to prevent the ongoing tortious acts, and 4) chooses to retain the employee, the company ratifies the tortious acts and may be held liable for exemplary damages." *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 653-54 (5th Cir. 1994).

In this case, Josie Taylor's June 2008 and February 2009 complaints put Seton on notice that John Butler had assaulted her, and was continuing to do so.  Thus, Seton knew about Butler's acts and recognized that his acts would continue if he had been retained.  Seton's failure to discipline or even counsel Butler after the June 2008 complaint indicates that it did nothing to prevent the assaults that occurred after June 2008, and chose to retain Butler.  As in the *Prunty* case, because Seton did not take action to stop the assaults after it was aware of them, Seton is responsible for those acts.  As such, all Plaintiffs state a claim for ratification and summary judgment should be denied on those claims.

Nor can the Texas Workers' Compensation Act provide the exclusive remedy for Plaintiffs' negligence claims against Seton.   While the general rule is that recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance. Tex. Lab.Code Ann. § 408.001(a), an intentional tort attributable directly to an employer is not within the purview of the Workers' Compensation Act. *Medina v. Herrera,* 927 S.W.2d 597, 600 (Tex.1996). Seton's ratification of Butler's intentional assaults on the Plaintiffs prevents the workers' compensation bar from applying in this case.

**F.      John Butler's Motion for Summary Judgment should be denied.**

John Butler contends that none of the Plaintiffs in this case state a claim for assault by offensive or provocative bodily contact because none of them can show that Butler "intentionally or knowingly caused physical contact" with them when Butler "knew or should reasonably have believed that the Plaintiff would regard the contact as offensive or provocative." Def. Butler Motion at 2.

Regarding Elizabeth Cooper's claims against Butler, he contends that they fail because of Ms. Cooper's alleged e-mail confirmation that she agreed with the statement Hue Nguyen drafted for her, and because she signed a "New Hire Check in Form" on which she stated she had no complaints[5]. Neither of these documents is probative of the ultimate issue of whether Mr. Butler assaulted Ms. Cooper. The New Hire Check in Form is undated, and Seton can produce no evidence of the date on which it was signed. As such, it does not demonstrate that she agreed that she liked working with John Butler after he began touching her inappropriately.  Similarly with the e-mail Statement allegedly agreed to by Ms. Cooper, there is no admissible evidence that Ms. Cooper actually agreed to the language of the statement, as she could not recall sending or receiving the e-mails relating to the statement.  Furthermore, given Hue Nguyen's behavior during the interview that led to her alleged agreement to the statement, a reasonable jury could find that Ms. Cooper withheld her true feelings about Mr. Butler and how his conduct had affected her because she was afraid for her job.

Butler argues similarly that Jennifer Nguyen's claims against Butler should be dismissed because she told Hue Nguyen during her interview that she did not take Butler's assaults seriously.

---

[5] Butler's motion refers to "Taylor" throughout on page 6.  Plaintiffs assume that he is referring to Ms. Cooper, as the evidence discussed relates to Ms. Cooper and not Ms. Taylor. Plaintiffs' response is based on that assumption.

41

Def. Butler Motion at 8.  However, like Ms. Cooper, Jennifer Nguyen also testified that Hue Nguyen intimidated her during the interview, discouraging her from reporting the full facts and causing her not to reveal the true effects of Butler's conduct on her.  Nor does the fact that Jennifer Nguyen did not complain about Butler until she was asked about him by Hue Nguyen defeat her assault claim, as Jennifer testified that she did not complain because she had seen what happened when Josie Taylor complained, and she did not think it would do any good.

Butler finally argues that Josie Taylor's claims against him should be dismissed because she did not complain about him until three months after the offensive conduct began, and complained shortly after receiving disciplinary notices.  However, as Ms. Taylor remarked in her April 2, 2009, complaint, she was complaining in part because she felt she was being retaliated against by the very disciplines she was receiving, *and* because Butler's conduct toward her still had not ceased.  With regard to the delay in her complaint, the Fifth Circuit has held an employee waiting from the springtime until July of the same year to report harassment was not unreasonable. *Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir. 1999).

All three of the Plaintiffs testified about how they found John Butler's touching and other inappropriate conduct to be offensive and provocative.  This is the testimony that must be credited on summary judgment, and based on this testimony, John Butler's Motion for Summary Judgment should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

**ROSS LAW GROUP**
1104 San Antonio Street
Austin, Texas 78701
(512) 474-7677 Telephone
(512) 474-5306 Facsimile

s/ Kell A. Simon                                    

</div>

Kell A. Simon
State Bar No. 24060888
ATTORNEY FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I hereby certify that on this the 12th day of September, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECFsystem, which will send notification to the following:

Edward M. ("Ted") Smith
Elizabeth ("Betsy") S. Chestney
Cornell, Smith & Mierl, LLP
1607 West Avenue
Austin, Texas 78701

Thomas A. Nesbitt
Scott F. DeShazo
DeShazo & Nesbitt, L.L.P.
100 Congress Avenue, Suite 800
Austin, Texas 78701


s/ Kell A. Simon
Kell A. Simon