# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| JOSIE TAYLOR, JENNIFER NGUYEN, | § | |
| and ELIZABETH COOPER | § | |
| | § | |
| V. | § | A-10-CA-650 LY |
| | § | |
| SETON HEALTHCARE d/b/a SETON | § | |
| MEDICAL CENTER WILLIAMSON, | § | |
| and JOHN BUTLER | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendant Seton Healthcare's Motion for Summary Judgment Against Plaintiff Elizabeth Cooper (Clerk's Dkt. #24); Defendant Seton Healthcare's Motion for Summary Judgment Against Plaintiff Jennifer Nguyen (Clerk's Dkt. #25); Defendant Seton Healthcare's Motion for Summary Judgment Against Plaintiff Josie Taylor (Clerk's Dkt. #26); Defendant John Butler's Motion for Summary Judgment (Clerk's Dkt. #27); Notice of Filing Evidence in Support of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (Clerk's Dkt. #28); Plaintiffs' Response in Opposition to Defendants' Motions for Summary Judgment (Clerk's Dkt. #29); Defendant Seton Healthcare's Reply to Plaintiffs' Response to Motions for Summary Judgment (Clerk's Dkt. #30); Seton's Brief regarding *Waffle House* (Clerk's Dkt. #33); and Plaintiffs' Brief regarding *Waffle House* (Clerk's Dkt. #34).

The motions were referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits of the motions pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the

United States District Court for the Western District of Texas. After reviewing the parties' pleadings, relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

## I. BACKGROUND

Plaintiffs Josie Taylor ("Taylor"), Jennifer Nguyen ("J. Nguyen"), and Elizabeth Cooper ("Cooper") were employees of Seton Healthcare d/b/a Seton Medical Center Williamson ("Seton"). They bring this action against defendants Seton and John Butler ("Butler"). In their complaint Plaintiffs allege Butler, their former Seton co-worker, committed assault and offensive physical contact by intentionally or knowingly causing Plaintiffs to suffer apprehension of imminent harmful or offensive bodily contact, along with actual offensive bodily contact. (Compl. ¶ 53). Additionally, Plaintiffs bring claims against Seton (1) for sexual harassment and retaliation under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e2(a)(1) ("Title VII") and the Texas Commission on Human Rights Act, Texas Labor Code § 21.001, *et seq*. ("TCHRA") and (2) for Butler's assault and offensive physical contact, based on theories of respondeat superior, ratification, and negligence.

According to Plaintiffs, they were sexually harassed by Butler from the time they each began working at Seton. (Compl. ¶¶ 11, 20-21, 30). They contend this harassment continued despite reports to Seton regarding Butler's conduct. (*Id*. ¶¶ 14, 17-18, 36). Plaintiffs further contend Seton retaliated against them after Taylor reported the harassment and J. Nguyen and Cooper filed charges against Seton regarding Butler with the Equal Employment Opportunity Commission ("EEOC") (*Id*. ¶ 19, 26, 38). Plaintiffs allege the sexual harassment and retaliation they were subjected to violated Title VII and the TCHRA. (*Id*. ¶¶ 39-52). They further allege that Butler's conduct constituted assault and offensive physical contact; that Seton ratified Butler's tortious acts; and that Seton was

negligent in its employment of Butler. (*Id*. ¶¶ 53-56). Plaintiffs seek actual, compensatory and punitive damages; attorneys' fees, expert fees and costs; pre- and post-judgment interest; and reinstatement, or in the alternative, front pay. (*Id*. at 13).

Butler has filed a motion for summary judgment, claiming that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law on Plaintiffs' claims of assault and offensive physical contact. (Butler's Mot. for Sum. J. at 3, 7, and 9). Seton also seeks summary judgment, claiming that there is no genuine issue as to any material fact and that Seton is entitled to judgment as a matter of law on Plaintiffs' claims of sexual harassment, retaliation, and liability for Butler's assault and offensive physical contact. (Def. Mot. For Sum. J. Against Pl. Taylor at 9; Def. Mot. For Sum. J. Against Pl. J Nguyen at 7; Def. Mot. For Sum. J. Against Cooper at 1-2). The parties have filed responsive pleadings and the matter is now ripe for determination.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254,106 S. Ct. 2505, 2513 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87,

(1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992).

The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 110, 122 (1993). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Id*.

### III. RELEVANT EVIDENCE[1]

The events giving rise to this lawsuit occurred at Seton Medical Center Williamson ("Seton Williamson") in the Medical Unit on the third floor. In this unit, Hue Nguyen ("H. Nguyen") was the Nurse Clinical Manager, which made her responsible for directing the daily operations of the unit and supervising the unit's nurses and clinical assistants, which included hiring, firing and disciplinary decisions. (H. Nguyen Aff. at ¶ 3). Butler was the charge nurse, which made him responsible for overseeing the floor; making sure the assignments were equitably distributed among the registered nurses and clinical assistants; and intervening in cases of concern or potential crisis. (Tom Alexander Depo. at 49:7-17). Butler stated that as charge nurse he did not have the ability to give written disciplinary writeups and that he would have to report any conduct problems to H. Nguyen. (Butler Depo. at 22:10-17). Taylor, J. Nguyen and Cooper were all clinical assistants in

---

[1]Because the case comes before the Court on a motion for summary judgment, the Court must view the facts in the light most favorable to Plaintiffs, and indulge all reasonable inferences in their favor. *Rosado*, 5 F.3d at 122. The facts are set forth consistent with this requirement.

this unit during the periods in which they allege Butler sexually harassed them. (Def. Mot. for Sum. J. Against Pl. Taylor at 2; Def. Mot. for Sum. J. Against Pl. J. Nguyen at 2; and Def. Mot. for Sum. J. Against Pl. Cooper at 2).

A.    **Evidence Regarding Taylor**

In March 2008, Taylor began her employment at Seton Williamson. (Compl. ¶10). On Taylor's first day of work, Butler grabbed her ponytail and jerked her head back and forth saying, "you like it like that, don't you?" (Taylor Depo. at 42:1-7). When she tried to pull away, Butler pulled back and Taylor's chair rolled as a result. (*Id.*). Another co-employee, Melanie Frazier, told Butler, "Stop that, John. It's sexual harassment," to which Butler responded by bending over Taylor and saying, "Oh, am I harassing you?" (*Id.* at 42:8-14). Frazier again said, "Stop it, John," after which Butler let go, laughed, and walked away. (*Id.*).

Thereafter Butler behaved in a manner that made Taylor uncomfortable every time he saw her. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 1). Specifically, he would touch her, try to rub her shoulders, grab her hair, and give her hugs. (*Id.*). She repeatedly told him to stop but he would not. (*Id.*). He would also make sexually-oriented comments to her, other coworkers, and patients, including, "I should beat you with a wet noodle. Oh no but you would like that" and "I heard all the films they make in endoscopy are x-rated." (*Id.*; Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 18). He also asked Taylor if she had been skinny dipping in the lake next to the hospital. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 1).

On or about June 21, 2008, Taylor met with Tom Alexander ("Alexander"), House Supervisor for Seton, and told him that Butler (1) pulled her hair, (2) ran his hand under her shirt pulling down her undershirt, and (3) made lewd comments to her. (Taylor Depo. at 44:24-45:6).

Alexander informed H. Nguyen and senior human resources generalist, Tracie Thor ("Thor") of Taylor's allegations. (*Id.* at 28).

On June 23, 2008, H. Nguyen met with Taylor. (H. Nguyen Aff. ¶ 9). The parties dispute Taylor's statements during this meeting. H. Nguyen testified that Taylor said she thought Butler was being playful and childish and that Butler had not touched her anywhere inappropriate. (*Id.*). Taylor stated she did not say that Butler was being "playful" or "childish" when he touched her. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 39). H. Nguyen told Taylor she would talk to Butler and to come to her if Butler made Taylor uncomfortable again. (H. Nguyen Aff. ¶ 9).

It is also disputed as to whether H. Nguyen counseled Butler after Taylor's first complaint. H. Nguyen stated that she went to Butler and informed him that the manner in which he was touching Taylor was making Taylor uncomfortable and could make others uncomfortable and that he should remain courteous to Taylor. (*Id.* ¶10). Butler testified during the criminal trial against him[2] that he did not know of the allegation until February 2009, indicating that H. Nguyen did not meet with him regarding the June 2008 complaint. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 17). Butler later testified that he had read some documents that caused him to question whether he was counseled in June 2008 but his testimony at the criminal trial was "truthful as far as [he knew] at the time." (Butler Depo. at 9:17-11:6).

---

[2]Plaintiffs reference *The State of Texas v. John C. Butler*, Cause No. 0800c0524 (Tex. Mun. Court—Williamson County transcript date Oct. 26, 2010) citing a criminal trial that involved Taylor's charges against Butler. (Pl. Res. to Def. Mot. for Sum. J. at 5). Plaintiffs provided three pages of a transcript from that trial demonstrating Butler's awareness of the sexual harassment complaints. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 17). No other information regarding this criminal case has been provided to the Court.

After Taylor's initial complaint, Butler's physical contact subsided for a short time but then began again. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 1). Butler blocked Taylor's way so that she had to touch him to move past him; he stood behind her chair in a threatening manner; and, instead of asking her to hand him items, he reached over her, rubbing against her, to get them himself. (*Id.*). Butler would also brush up against Taylor with his hips and Taylor concluded he "probably" touched her with his genital area. (Taylor Depo at 155:22-156:5). Taylor also testified that she did not remember whether Butler ever touched her breasts but that he was constantly brushing up against her and so "at some point he probably did come in contact with [her] breasts." (Taylor Depo at 215:12-20). When asked whether Butler reached out his hand and touched her rear end, Taylor testified "It's entirely possible. I don't remember specifically. . . . [T]here were too many unwanted physical contacts for me to . . . just select one on that." (*Id.* at 217:12-17).

On February 20, 2009, H. Nguyen disciplined Taylor regarding excessive tardiness. (H. Nguyen Aff. ¶ 12). Two days later Taylor emailed H. Nguyen complaining of Butler's conduct. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 18). Specifically, Taylor stated that Butler constantly hugged female employees, patients and their family members—regardless of their consent. (*Id.*). She stated that, although Butler has rarely touched her since her first complaint about him, he regularly invaded her personal space by leaning over her and sitting too near her. (*Id.*). Specifically, on February 21, 2009, he positioned his chair next to hers, put one arm on the back of her chair, leaned toward her, then rubbed his groin on the outside of his pants. (*Id.*; Taylor Depo at 152:21-153:12).

Upon receipt of Taylor's email complaint on February 22, 2009, H. Nguyen forwarded it to Thor stating, "This is the charge nurse who I had verbally counseled several months ago, he has stopped for a while now is having this inappropriate behavior again." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 18). The next day on February 23, 2009, Thor suggested H. Nguyen explain to Taylor that she has spoken with Butler and explained that his behavior is not acceptable and will not be tolerated; ask Taylor to let H. Nguyen know immediately if Butler continues to behave inappropriately; ensure that Butler knows he must refrain or be written up for a Group 1 violation and can be suspended and/or terminated if things progress; and write Butler up for "discourteous" behavior because Taylor already talked to him and he has continued to behave inappropriately. (*Id.*). Thor states that she spoke to Butler on February 23, 2009, to let him know of the accusations. (Thor Depo. at 48:16-20). Thor also stated Butler was removed from his position as charge nurse. (*Id.* at 82:20-21).

After the February 22, 2009, e-mail, H. Nguyen tried to ensure that Taylor and Butler did not work at the same time but was not always able to do so. (H. Nguyen Depo. at 59:4-11). Thor stated that human resources never instructed that Taylor and Butler not be assigned to work the same shift because Butler was already trying to transfer out of the unit and Thor had discussed with Taylor whether she would like to move to another floor. (Thor Depo. at 115:18-116:12).

On March 6, 2009, Butler received a disciplinary writeup for "[d]iscourtesy to patients, visitors or other employees." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 19). The writeup cites inappropriate behavior toward a coworker which was perceived as sexual harassment, inappropriate remarks in front of patients and other staff, and hugging new staff making them uncomfortable. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 19). The report

also states that "[p]reviously, on June 23, 2009 [sic] [Butler] received a verbal counseling for similar behavior, was reminded of Seton's HR Policy #300.13, and understood that this was not appropriate behavior." (*Id.*). Butler was mandated to attend a class on Harassment in the Workplace as a condition of his continued employment. (*Id.*). Taylor points out that the writeup was not for sexual harassment, a higher level violation that is punishable by "discharge" or "in unusual instances, written warning, and/or suspension without pay." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 21).

On April 1, 2009, H. Nguyen issued an oral warning and a written employee counseling report to Taylor for using "inappropriate, unprofessional, or crude language in responding to a question from a new staff member." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 29). Specifically, a concerned coworker reported that Taylor used the word "fuck" in an angry exclamation to a new clinical assistant who, on his first day of work, asked Taylor whether she had completed a patient's bath. (H. Nguyen Aff. ¶16).

The next day Taylor sent an email to H. Nguyen complaining about Butler's behavior and stating that she believed she was being singled out and retaliated against for the sexual harassment complaints she made. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 23). Specifically, she stated her last complaint was only a month ago and the harassment had not stopped. (*Id.*). She also stated she was disciplined for allegedly saying the word "fuck" at work but has heard almost every other employee at Seton use the word on the job and does not believe any of them have been written up. (*Id.*).[3] She stated she believed she was being discriminated against because of her

---

[3]However, H. Nguyen states in her affidavit that she had counseled other employees for using similar language, including one incident based on an October 2008 email complaint that Taylor made about an employee using the word "fuck" in the workplace. (*Id.*; H. Nguyen Aff. Ex. E; Taylor Depo.

gender and retaliated against because she had complained about having been sexually harassed by Butler. (*Id.*).

On April 6 and 8, H. Nguyen interviewed a number of coworkers about Butler, including those who had been identified in Taylor's February 22, 2008 complaint. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 4, 5, and 6). Thor states that on April 10, 2009, she met with Taylor to ensure Taylor was comfortable at work and to confirm that Butler was no longer touching Taylor, and Taylor confirmed that he was not. (Thor Aff. ¶ 10).

On May 5, 2009, Thor sent an email to Melanie Fox asking Fox to reach out to Taylor to discuss Taylor's concerns. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 37 at 3). Thor noted that Taylor felt she was being retaliated against due to her complaints against Butler and that Butler is allowed to continually harass her. (*Id.*). When asked by Fox in a response e-mail whether Thor, Fox, H. Nguyen, and Taylor should meet together, Thor responded, "Yes, that way [Taylor] can not make false statements regarding what I or [H. Nguyen] have [stated]." (*Id.* at 2). In May 2009 Seton received notice that Taylor had filed an EEOC charge against Seton alleging discrimination. (Thor Aff. ¶ 8). In late May and early June, Thor undertook an investigation into the complaint against Butler, interviewing individuals from the third floor. She concluded that her investigation did not substantiate Taylor's allegations. (*Id.* ¶9).

On October 21, 2009, Taylor received a second disciplinary writeup. This writeup described a human resources policy violation for "careless and negligent performance" in which Taylor was allegedly found talking on her cell phone and looking at a computer instead of monitoring the telemetry monitors for patient alarms which were going off. (Ev. in Supp. of Pl. Res. in Opp. to Def.

at 65:17-25).

Mot. for Sum. J., Ex. 30). In the report, Taylor was also cited for allegedly having a personal conversation with a former employee in the telemetry room where confidential patient information is viewable. (*Id.*) When she signed the writeup, Taylor wrote that she was never questioned prior to being presented with the report and that the statements were untrue fabrications designed to retaliate against her for her complaints against Butler. (*Id.*) Finally, on October 21, 2009, Taylor sent an email to H. Nguyen, Thor, and others, stating that she was resigning her employment with Seton. (Taylor Depo. at 205:10-17).

### B. Evidence Regarding J. Nguyen

J. Nguyen began working at Seton in June 2008. (J. Nguyen EEOC Charge at 2). She claims that Butler engaged in inappropriate conduct toward or around her starting on or about July 31, 2008. (Compl. ¶20-21). J. Nguyen testified that Butler purposefully touched her breasts and rear end numerous times during 2008 and 2009. (J. Nguyen depo. at 156:21-22, 157:12-24). Specifically, he touched her breasts by wrapping his arms around her chest from behind; he touched her rear end by "coming up behind [her] and either rubbing off of [her] or grabbing behind [her]." (*Id.* at 158:11-159:4; 161:7-16).

J. Nguyen further testified that Butler smelled her hair numerous times and that he touched her hair more than three times. (J. Nguyen Depo. at 111:13-18; 112:2-6). She stated he pulled her hair from behind if she was wearing a ponytail and that the pulling at times caused her physical pain. (*Id.* at 153:14-22). She further testified that Butler said sexual things towards her, rubbed himself in front of her, grabbed her waist, and rubbed her shoulders. (*Id.* at 116:2-5). J. Nguyen reported she became physically ill at the sight of Butler or knowing that she had to work with Butler such that

she experienced "nausea, vomiting, anxiety, depression, not wanting to be there, not wanting to work." (*Id.* at 154:24-155:13).

H. Nguyen interviewed J. Nguyen on or around April 6, 2009, regarding Taylor's February 22, 2008, complaint which stated J. Nguyen had been sexually harassed by Butler. (*Id.* at 32:8-9). H. Nguyen summarized J. Nguyen's interview responses and presented the summary to J. Nguyen, who signed it. (*Id.* at 31:7-33:5). According to the summary, J. Nguyen said she had been touched inappropriately by Butler, who had grabbed her around the waist, rubbed her back and smelled her hair. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 4). She said she did not report these incidents because "[she] did not take it seriously. [She] blew it off. [She] did not want to get anyone into trouble." (*Id.*). She also said she believed Butler acted with sexual intention but she did not report it because "he seems harmless." (*Id.*). She said she told him to stop and that the last time he had touched her was over a month ago. (*Id.*).

In her deposition, J. Nguyen stated that in this interview H. Nguyen intimidated her and discouraged her from reporting Butler's harassment. According to the testimony, H. Nguyen noted that J. Nguyen was going through a divorce, and thus she "did not need this at this point in [her] life." (J. Nguyen Depo. at 37:8-20). H. Nguyen did not ask her what parts of her body Butler touched, how many times Butler touched her, or when the inappropriate contact began. (*Id.* at 160:2-15). J. Nguyen claims she did not review the summary that H. Nguyen prepared before she signed it because she "was upset about the way [she] was being treated and [she] just wanted to get out of there as quickly as possible." (*Id.* at 199:1-7). J. Nguyen also stated she did not report the harassment earlier because she knew Butler was harassing Taylor despite Taylor's prior complaint. (*Id.* at 105:1-7).

J. Nguyen did not interact with Butler after her interview with H. Nguyen. (*Id.* at 199:11-17). J. Nguyen actively avoided Butler, and H. Nguyen took steps to minimize their interactions by intentionally scheduling Butler and J. Nguyen so that they had different patient assignments. (*Id.* at 199:11-17, 200:20-201:7; H. Nguyen Aff.¶ 7). Several days after the interview (in early to mid-April), H. Nguyen summoned J. Nguyen and told her that her job performance was not up to par. (Compl. ¶ 25). Then, on April 29, 2009, J. Nguyen's lawyer sent J. Nguyen's sworn statement to the EEOC charging that Seton had discriminated against her based on her gender, and that it had also retaliated against her. (J. Nguyen Depo. 208:3-18; Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 2). The statement did not mention any hair pulling or any incident in which Butler touched her breast or rear end. (*Id.*). On May 26, 2009, H. Nguyen received notice that J. Nguyen had filed the EEOC Charge. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 24). Upon receipt of the charge, Seton conducted an investigation into the allegations, including contact with J. Nguyen, who declined to comment. (Thor Aff. ¶ 4; J. Nguyen Depo. at 64:4-22).

On June 3, 2009 H. Nguyen gave J. Nguyen her first disciplinary write-up, citing a late call-in that allegedly occurred on May 27, 2009. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 25). The write-up states that J. Nguyen "called the charge nurse at 5:30 AM to ask if she was going to be cancelled for the shift. The charge nurse told Jennifer no and that the floor was busy and she needed to come in to work as scheduled. At 5:45 AM Jennifer called in ill." (*Id.*). This was considered a late call-in. (*Id.*).

On June 22, 2009 H. Nguyen issued a verbal coaching to J. Nguyen citing a June 6, 2009 unscheduled absence as J. Nguyen's third unscheduled absence in a three-month period. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 26). J. Nguyen received pay raises on

schedule with other employees in October of 2008 and October of 2009. (H. Nguyen Aff.¶ 79; J. Nguyen Depo. at 22:1-23:15).

On December 22, 2009, H. Nguyen issued J. Nguyen a disciplinary write-up citing insubordination for changing shifts without receiving approval of the charge nurse or the manager. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 27). Although J. Nguyen disagreed with the conclusion that she did not handle the shift change correctly, she did not appeal the writeup. (J. Nguyen Depo. at 86:12-13; 87:3-5). In January 2010, J. Nguyen received a promotion from Clinical Assistant I to Clinical Assistant II, which also involved a raise in pay. (*Id.* at 23:16-24; 82:19-83:17).

On March 4, 2010, J. Nguyen was terminated for allegedly charting vital signs that she had not taken (the events at issue had taken place on February 22, 2010). (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 28). Seton relied on the fact that vital signs had not been taken on the "monitor" in the patient's room but had been charted there. (*Id.*). The disciplinary report states that vital signs for two patients were charted by J. Nguyen at 15:30 and 15:37 but neither of the monitors for these patients showed vital signs were recorded at those times. (*Id.*). One of the patients who was alert and oriented stated no one took her vital signs at or around that time. (*Id.*). In August 2009, H. Nguyen terminated another employee who she supervised for falsifying records regarding a patient's vital signs. (H. Nguyen Aff. ¶ 14 & Ex. G). According to H. Nguyen, that employee had not complained about harassment or discrimination. (*Id.*).

C. **Evidence Regarding Cooper**

Cooper started working at Seton in late January or early February 2009. (Cooper Depo. at 39:18-39:23). The first time Cooper met Butler he put his hand on her shoulder. (*Id.* at 43:8-14).

Cooper testified that on or around February 7, 2009, Butler put his hand around her waist and pulled her into a supply closet where they gathered supplies to draw blood on a patient. (*Id.* at 45:1-9; 149:15-22).[4] When Cooper asked Butler why he had put his hand on her waist and pulled her, Butler replied that it was "to teach [her] how to do things around here." (*Id.* at 45:24-46:1). Cooper responded that she was uncomfortable with him doing that and asked him not to touch her like that again. (*Id.* at 46:2-5). Even after that incident, and despite Cooper's objections, Butler continued to touch Cooper (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 3 at 2). On several occasions on weekends in February 2009, Butler would tell Cooper "If I want you hurt I would do it myself." (*Id.*) He would also grab Cooper and shake her. (*Id.*)

On or around February 14, 2009, Cooper was in the supply closet when Butler entered and tightly put his arms around Cooper's arms and chest from behind for a couple of seconds. (Cooper Depo. at 46:22-47:2, 153:3-7). Cooper testified that Butler did not touch her breast area. (*Id.* at 47:3-9). When Cooper asked him what he was doing, Butler told her "he was going to beat [her] with a wet noodle if [she] did not start doing things correctly." (*Id.* at 47:13-20). After this incident, Cooper called H. Nguyen and told her what had happened in the supply closet. (*Id.* at 68:13-69:4). She said she felt uncomfortable being around Butler and working with him. (*Id.*). Despite this, Butler continued to put his hand or his arm on Cooper's shoulders until she transferred to the night shift in late March or early April 2009. (*Id.* at 48:25-49:4).

Cooper completed an undated New-Hire Check-In form, which is to be completed during a conversation between the employee and her manager after 60 days of employment. (*Id.* at 52:24-

---

[4]The supply closet is a lit working area half the size of a conference room with entrances on two sides, a utility area and a washing station where employees enter frequently to get supplies (*Id.* at 152:8-153:2).

53:18, 39:18-39:23).  In Cooper's case, this would have been in late March or early April.  (*Id.*).

Cooper admits that she gave H. Nguyen the answers to the questions reflected on the New Hire

Check-In form and that she signed the form because she agreed with its contents.  (*Id.* at 52:15-

52:24, 157:1-158:8).  On the form, Cooper stated that the job met her expectations, that her

frustrations were with the patient load, that Butler had been particularly helpful, and that she loved

all the staff.  (*Id.* at 53:19-54:23, Ex. 3).

In an investigation into Taylor's harassment complaint against Butler in early April 2009, H.

Nguyen interviewed Cooper by phone to discuss Butler.  (*Id.* at 166:1-24). In her deposition, Cooper

recounted the following:

> [H. Nguyen asked] me if I was sure I wanted to go through with telling her what I had
> said about John or not, because it could affect his career and possibly mine in the
> future at some point. . . .  [H. Nguyen then said] "I know you're under a lot of stress
> because of what's going on with your family life. Will you be able to answer these
> questions?"And I was already flustered and upset. I was crying whenever she had
> —before she started asking me any of these questions. So I was somewhat under the
> impression that if I mentioned anything in the questions that she asked me about what
> had happened in the supply closet, that I could possibly be terminated or something
> along those lines, and I was so new that I didn't want to lose my job.

(*Id.*).  On April 7, 2009, H. Nguyen emailed Cooper a summary of the interview, asking Cooper to

either respond confirming the accuracy of the summary or make corrections to the summary.  (H.

Nguyen Depo. Ex. 15).  In an email response, Cooper confirmed the accuracy of the summary, which

stated that she did not witness any sexual misconduct; that she had not been touched inappropriately;

that Butler had hugged her once "in a thankful way;" and that she did not have any concerns

regarding sexual misconduct.  *(Id.)*.  Cooper did not recall receiving the email from H. Nguyen

attaching her statement but she did acknowledge it is possible that she received it.  (Cooper Depo.

at 60:11-61:6).  She also could not recall sending the April 8, 2009, response email confirming the

accuracy of the statement, but she did state it may have happened. (*Id.* at 64:17-65:18). On June 10, 2009, Thor followed up with Cooper, who confirmed that the April 7 interview summary remained accurate. (*Id.* at 65:22-25). Cooper also does not recall being contacted by Thor or speaking to her about the sexual harassment allegations but does not deny that it occurred. (*Id.* at 66:11-20).

H. Nguyen and Thor first heard of Cooper's complaint when they received the EEOC charge she filed in Autumn of 2009. (H. Nguyen Aff. ¶ 9; Thor Aff. ¶ 4). In December 2009, Cooper was disciplined by Seton for lying about why she had to edit her time entry, claiming she had lost her badge when she had not. (H. Nguyen Aff. ¶ 10, Ex. C). Cooper admitted that she lied about why she had to edit her time entry and stated that Seton was justified in disciplining her for lying. (Cooper Depo. at 105:10-108:10, Ex. 10). Seton suspended her without pay for this misconduct. (*Id.* at 105:10-106:3; H Nguyen Depo. at ¶ 10).

The day Cooper was scheduled to return to work following her suspension she was tardy and sent H. Nguyen an email resigning. (H. Nguyen Aff. ¶ 11, Ex. D). Cooper testified that she was not claiming that Seton forced her to resign but that she was resigning because she thought it would look better to resign than be terminated—a consequence she anticipated for being tardy immediately after a suspension for lying. (Cooper Depo. at 113:22-24, 114:12-115:11).

### D. Evidence Regarding Seton's Treatment of Butler

It is undisputed that various Seton staff members assisted Butler in obtaining a transfer to a position outside of Seton Williamson and purposefully did not mention the sexual harassment charges. After Butler was issued the March 6, 2009, disciplinary writeup, Butler tried to transfer out of the unit. (Thor Depo. at 80:25-81:6). Thor testified that "we were trying to help facilitate that." (*Id.*). Thor stated that Butler's transfer out of Seton was a group effort, involving everyone from

Thor and H. Nguyen to the President of Seton Williamson to Seton's head of Human Resources, Cheryl Williams ("Williams"). Butler eventually received a position at Seton's Brackenridge facility after the President of Seton Williamson contacted the President of Brackenridge on Butler's behalf, stating that the transfer was being "requested to alleviate a non-performance related situation that had arisen." (*Id.* at 122:23-125:15).

In an email, Williams instructed Thor to make sure Butler did not discuss anything related to his transfer or the "SMCW Issue" when he was attempting to obtain another position within the Seton network. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 38).[5] Thor did not tell recruiters that Butler had been disciplined for inappropriate conduct or that sexual harassment allegations had been made against him. (Thor Depo. at 118:17-119:20). During the process of securing a transfer for Butler, Seton paid him and did not require him to come to work. (Thor Depo. at 134:2-25; 137:11-13).

## IV. BUTLER'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs allege Butler intentionally or knowingly caused Plaintiffs to suffer apprehension of imminent harmful or offensive bodily contact, along with actual offensive bodily contact. (Compl. at 53). To prevail on their claims of assault by offensive or provocative bodily contact, Plaintiffs must show that (1) Butler intentionally or knowingly caused physical contact with them and (2) he knew or should have reasonably believed that Plaintiffs would regard the contact as offensive or provocative. *See* Tex. Penal Code Ann. § 22.01(a); *see also Johnson v. Davis,* 178 S.W.3d 230, 240

---

[5]Plaintiffs contend that the "SMCW Issue" refers to the sexual harassment charges. (Pl. Res. in Opp. to Def. Mot. for Sum. J. at 18).

(Tex.App.—Houston 2005, pet. denied) (elements for a civil assault are the same as for a criminal assault).[6]

### A.     Josie Taylor's Assault Claim Against Butler

Taylor alleges that Butler intentionally or knowingly caused physical contact with her and that he knew or should have reasonably believed that she would regard the contact as offensive or provocative. Specifically, she testified that he pulled her hair, ran his hand under her shirt pulling down her undershirt, blocked her way so that she had to touch him to move past him, stood behind her chair in a threatening manner, and rubbed himself against her. (Taylor Depo. at 44:24-45:6; Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 1). Further, she repeatedly told him to stop. (*See, e.g.,* Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 1). Thus, Taylor has provided specific facts showing that (1) Butler intentionally or knowingly caused physical contact with her and (2) he knew or should have reasonably believed that she would regard the contact as offensive or provocative.

Butler asserts summary judgment is appropriate because Taylor's conduct and words show that she did not actually find Butler's conduct offensive or provocative. (Butler's Mot. for Sum. J. at 9). In support of his assertion, Butler points out that Taylor did not report the ponytail pulling incident to Seton management until approximately three months after the incident, despite receiving Seton's sexual harassment policy outlining the process for reporting unwelcome conduct. He also

---

[6]Butler asserts that no plaintiff provides any evidence of harm. However, actual injury or damage is not an element of a claim for assault by offensive contact. *Moore v. Agrawi*, 2007 WL 2743494, at *3 (Tex.App.—Houston Sept. 20, 2007, no pet.). Thus, damages will not be addressed in determining whether summary judgment is appropriate.

argues that Taylor's subsequent claims of harassment were merely vague and unspecified complaints in response to disciplinary writeups that Seton had issued her.

Concerning her delay in reporting harassment, Taylor responds that the Fifth Circuit has held that a jury could find an employee waiting from springtime to July of the same year to report sexual harassment not unreasonable. *See Watts v. Kroger Co.*, 170 F.3d 505, 510, (5th Cir. 1999). Concerning the proximity of her complaints to her writeups, Taylor responds that she was complaining both because she felt she was being retaliated against for her complaints and because Butler's conduct toward her still had not ceased. (Pl. Res. in Opp. to Def. Mot. for. Sum. J. at 42).

While Butler cites evidence suggesting Taylor did not find the contact offensive or provocative, the issue is whether Butler did or should have regarded the alleged contact as offensive or provocative—not whether Taylor herself did. And more to the point given that this is a motion for summary judgment, the issue is whether there is a fact dispute regarding this issue. It should be clear by now that there is ample evidence which, if credited, would demonstrate that Butler actually did know, or certainly should have known, that Taylor regarded his contact as offensive. Neither her delay in reporting nor the timing of her report in relation to her disciplinary writeups demonstrates there is no genuine issue of material fact regarding her claim. Construing the summary judgment evidence in the light most favorable to Taylor, Butler has failed to demonstrate there is no genuine issue of material fact regarding this claim. Accordingly, summary judgment should be denied with regard to Taylor's assault claim against Butler.

### B. Jennifer Nguyen's Assault Claim Against Butler

J. Nguyen testified that on numerous occasions Butler wrapped his arms around her chest from behind, touched her rear end, smelled and touched her hair, pulled her hair, grabbed her waist.

and rubbed her shoulders. (J. Nguyen Depo. at 158:11-159:4, 161:7-16, 111:13-18; 112:2-6, 153:14-22, 116:2-5). Further, she told Butler to stop the conduct. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 4). J. Nguyen has thus provided specific facts showing that (1) Butler intentionally or knowingly caused physical contact with her and (2) he knew or should have reasonably believed that she would regard the contact as offensive or provocative.

As with the claims by Taylor, Butler asserts that summary judgment is appropriate on Nguyen's claims because her conduct and words show that she did not actually find Butler's conduct offensive or provocative. (Butler's Mot. for Sum. J. at 7). Butler points out that prior to her April 6, 2009, interview with H. Nguyen, J. Nguyen never reported any accusation against Butler to Seton management, and J. Nguyen does not claim that there was any improper touching after that interview. (J. Nguyen Depo. at 100:6-8, 102:10-13). Butler points to J. Nguyen's interview summary, where she states that she did not report any of the alleged harassment incidents because "[she] did not take it seriously. [She] blew it off," and stated that Butler "seemed harmless." (*Id.* Ex. 4). Butler further points out that J. Nguyen's EEOC declaration does not mention the hair pulling and touching of breasts and rear end which she now claims in this action. (*Id.* at 208:3-18).

J. Nguyen responds that the statements in the interview summary are inaccurate, and are the result of H. Nguyen's intimidation, and discouragement of reporting the full facts. (Pl. Res. in Opp. to Def. Mot. for. Sum. J. at 42). She adds that she did not bring up Butler's conduct until interviewed by H. Nguyen because she had seen what happened when Taylor complained and did not think a complaint would do any good. (*Id.*). If credited, this testimony suggests quite clearly that H. Nguyen was attempting to discourage J. Nguyen from making any complaints about Butler (saying things such as because J. Nguyen was going through a divorce, she "did not need this at this

point in [her] life."). There are obvious factual disputes regarding Butler's conduct, and Nguyen's reaction to it. Construing the summary judgment evidence in the light most favorable to the non-movant, Butler has failed to demonstrate there is no genuine issue of material fact regarding this claim. Accordingly, summary judgment should be denied with regard to J. Nguyen's assault claim against Butler.

### C. Elizabeth Cooper's Assault Claim Against Butler

Cooper offered testimony regarding Butler much like that of Taylor and Nguyen. (Cooper Depo. at 48:25-49:4, 45:1-9; 149:15-22, 46:22-47:2, 153:3-7). She also testified that Butler made sexually suggestive comments to her during the supply closet incidents. (*Id.* at 45:24-46:1, 47:13-20). She added that "even after [the supply closet] incident, he continued to touch me whenever we worked together. I would always tell him to stop touching me or to get off me, but he would not stop." (Elizabeth Cooper EEOC Declaration at 2). On several occasions on weekends in February 2009, Butler would tell Cooper, "If I want you hurt I would do it myself." (*Id.*) He would also grab Cooper and shake her. (*Id.*) Cooper has thus provided testimony demonstrating that Butler intentionally or knowingly caused physical contact with her and he knew or should have reasonably believed that she regarded the contact as offensive or provocative.

As with the other two plaintiffs, Butler once again contends that there is no evidence that Cooper actually found his alleged conduct to be offensive or provocative. (Butler's Mot. for Sum. J. at 3). Butler asserts that Cooper's own statements demonstrate she was not offended his actions. Butler points out that on the New-Hire Check-In Form Cooper completed after the alleged assaults, she stated that the job met her expectations, and the only frustrations noted related to the patient load. (Cooper Depo. at 53:19-54:23, Ex. 3). Further she stated on the form that Butler had been

22

particularly helpful, and that she loved all the staff. *Id.* Butler also points out that during the sexual harassment investigation in April 2009, Cooper told H. Nguyen that she had not been improperly touched by anyone on the third floor and that Butler hugged her when she first started in a thankful way and not with sexual intention. (H. Nguyen Depo. Ex. 15).

Cooper responds that the New Hire Check-In form is undated and no evidence has been produced showing the date on which it was signed. (Pl. Res. in Opp. to Def. Mot. for Sum. J. at 41). With regard her email statement, Cooper responds that she cannot recall sending or receiving the emails relating to the statement. *(Id.)*. Furthermore, Cooper argues that a reasonable jury could find that she withheld her true feelings about Butler and how Butler's conduct affected her because of Hue Nguyen's intimidating behavior during the interview. *(Id.)*.

As with the other assault claims, Cooper's claim survives summary judgment. There are numerous material facts that are in dispute regarding the claim, and a jury must hear and resolve these conflicts before a judgment would be appropriate. Construing the summary judgment evidence in the light most favorable to Cooper, Butler has failed to demonstrate there is no genuine issue of material fact regarding this claim. Accordingly, summary judgment should be denied with regard to Cooper's assault claim.

## V. SETON'S MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs claim they were subjected to sexual harassment and retaliation in violation of the TCHRA and Title VII. Both parties treat Title VII and the TCHRA as identical for the purpose of evaluating Plaintiffs' claims. When applying the THCRA, the Fifth Circuit looks to "analogous federal law contained in [Title VII]." *Estate of Martineau v. ARCO Chemical Co.*, 203 F.3d 904, 912 (5th Cir. 2000) (citing *Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 n. 5 (5th Cir.1995));

*see also* Texas Labor Code § 21.001 (2003) (purpose of the TCHRA is to provide for execution of Title VII). Accordingly, the Court will treat the TCHRA claims as identical to Title VII claims for the purposes of determining whether summary judgment should be granted.

## A. Plaintiffs' Sexual Harassment Claims

There are two types of sexual harassment claims that can expose an employer to liability for sexual harassment committed by its employee: (1) claims based on tangible employment action resulting from a refusal to submit to a supervisor's sexual demands ("quid pro quo claims"); and (2) claims not based on tangible employment actions but involving severe and pervasive sexual harassment ("hostile work environment claims"). *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. V. Ellerth*, 524 U.S. 742 (1998). In their claims against Seton for Butler's conduct, Plaintiffs allege only hostile work environment claims.

A hostile work environment claim consists of five elements: (1) the plaintiff belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986). For harassment to affect a term, condition, or privilege of employment under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)) (alteration in original). To determine whether an environment is sufficiently "hostile" or "abusive" within the meaning of Title VII, courts look at the totality of the circumstances including "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

"A recurring point in [Supreme Court] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 778 (citation omitted) (alteration in original). The alleged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999)). In addition, "[t]o survive summary judgment, the harassment must be 'so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place.'" *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 326 (5th Cir. 2004) (quoting *Shepherd*, 168 F.3d at 874).

An employer may be held responsible for a hostile work environment "if it knew or should have known of the harassment and failed to take prompt remedial action." *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993) (citing *Jones*, 793 F.2d at 720). A plaintiff may establish an employer's knowledge by demonstrating either actual or constructive notice. *Sharp v. City of Houston*, 164 F.3d 923, 929-930 (5th Cir. 1999). Actual notice can be proven by evidence that the plaintiff complained to someone in management with the authority to take remedial action. *Id.* at 929. Constructive notice is demonstrated by showing the harassment was sufficiently pervasive to give "rise to the inference of knowledge or constructive knowledge" on the part of someone with

remedial authority. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989) (internal quotation marks omitted).

The Fifth Circuit has held that once an employer acquires knowledge of the harassment, it "must take prompt and appropriate remedial action, 'reasonably calculated' to end the harassment." *Waltman*, 875 F.2d at 479 (citing *Jones*, 793 F.2d at 719-720). Whether an employer's response is sufficient "will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." *Waltman*, 875 F.2d at 479 (citations omitted). "[N]ot every response by an employer will be sufficient to discharge its legal duty. Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not "reasonably calculated" to halt the harassment."*Id.*

### 1.     Taylor's Hostile Work Environment Claim

Seton contests elements four and five of each Plaintiff's hostile work environment claim.[7] Regarding the fourth element of Taylor's claim, Seton argues that the facts are not sufficiently severe or pervasive to be considered a hostile environment. In support of this argument, Seton relies on two Fifth Circuit cases—*Hockman v. Westward Communications* and *Shepherd v. Comptroller*—which affirmed summary judgments against plaintiffs claiming a hostile environment. In *Hockman*, the plaintiff complained that:

> in the approximate year and a half that she worked for Westward, Rogers harassed her in the following ways: (1) he once made a remark to Hockman about another employee's body, (2) he once slapped her on the behind with a newspaper, (3) he "grabbed or brushed" against Hockman's breasts and behind, (4) he once held her

---

[7]The fourth element is whether the harassment affected a term, condition, or privilege of employment; the fifth is whether the employer knew or should have known of the harassment and failed to take prompt remedial action. *Jones*, 793 F.2d at 719-20.

cheeks and tried to kiss her, (5) he asked Hockman to come to the office early so that they could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands.

*Hockman*, 407 F.3d at 328. The Fifth Circuit found these facts did not rise to the level of severe or pervasive harassment necessary to affect the terms, conditions, or privileges of her employment. *Id.*

In *Shepherd* the plaintiff complained that:

on one occasion [co-worker] Moore stood in front of Shepherd's desk and remarked "your elbows are the same color as your nipples." Shepherd testified that Moore remarked once "you have big thighs" while he simulated looking under her dress. Shepherd claimed Moore stood over her desk on several occasions and attempted to look down her clothing. According to Shepherd, Moore touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her. Shepherd alleged additionally that on two occasions, when Shepherd looked for a seat after coming in late to an office meeting, Moore patted his lap and remarked "here's your seat. . . ." The conduct about which Shepherd complains allegedly took place over two years.

*Shepherd*, 168 F.3d at 872. The Fifth Circuit found Moore's behavior was not sufficiently severe to render Shepherd's work environment objectively "hostile" or "abusive" and thus affect a "term, condition, or privilege" of employment. *Id.* at 874-875.

Seton contends the alleged physical contact between Butler and Taylor is less severe than the contact plaintiffs claimed in *Hockman* and *Shepherd*. Although the individual incidents in *Hockman* appear more severe than those alleged by Taylor, Butler's alleged behavior is more pervasive as Taylor alleges Butler would touch her, try to rub her shoulders, grab her hair, and give her hugs almost every time he saw her. And, although the verbal remarks made in *Shepherd* appear more severe, the physical contact alleged in this case is more severe than in *Shepherd* since Butler is alleged to have regularly touched Taylor, including her breast area and rear end. Based upon a consideration of the totality of the circumstances, a jury could find that Butler's alleged harassment

of Taylor was sufficiently severe and pervasive to satisfy the fourth element of her hostile work environment claim.

Seton also contends that Taylor cannot establish that it failed to take prompt remedial action once it was aware of Butler's conduct. Taylor responds with two argument: (1) Butler had supervisory authority over her and the fifth element thus need not be considered and (2) Seton knew about Butler's harassment and took no action to cause it to stop. (Pl. Resp. In Opp. To D. Mot. for Sum. J. at 29).

Regarding supervisory authority, the Fifth Circuit has held that, as a result of the Supreme Court's decisions in *Faragher* and *Ellerth*, only the first four elements need to be satisfied in a Title VII sexual harassment case alleging harassment by a "supervisor with immediate (or successively higher) authority" over the harassed employee. *Watts*, 170 F.3d at 509. Seton disputes Taylor's assertion that Butler had supervisory authority by stating that Butler was not a supervisor in the context of Title VII. Although the Supreme Court did not define what constitutes a "supervisor with immediate (or successively higher) authority," a number of circuits have attempted to define the boundaries of such authority in light of *Faragher* and *Ellerth*. In *Summerville v. Ross/Abbott Laboratories*, 1999 WL 62386 at *7 (6th Cir. 1999) the Sixth Circuit held that a supervisor is "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Id.* The Court in *Summerville* held that a "Crew Leader," who was the leader of a "peer group" of employees but did not exercise significant control over hiring, firing or conditions of employment, was not a supervisor for the purposes of Title VII. *Id.* at 8. Similarly, in *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998), the Seventh Circuit held that the "essence of supervisory status is the authority to affect the

terms and conditions of the victim's employment" and "[t]his authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer." *Id.*

Although the Fifth Circuit has yet to specifically address this issue after *Faragher* and *Ellerth*, before those decisions were rendered, the Fifth Circuit held that a supervisor who lacks the authority to hire and fire agency employees and could only recommend that employees receive awards or be subject to disciplinary action, has insufficient authority to be considered an agent within the meaning of Title VII. *Pfau v. Reed*, 125 F.3d 927, 937 (5ᵗʰ Cir. 1997). Thus, the weight of case law on this issue leans toward limiting the *Faragher* and *Ellerth* standard for supervisory status to employees with authority to affect the terms and conditions of the victim's employment—specifically, the power to hire, fire, demote, promote, transfer, or discipline. Butler's "charge nurse" position was not supervisory, as it is undisputed that he did not have the ability to hire, fire, promote, transfer, or discipline the plaintiffs in this case. Because Butler was not a "supervisor with immediate (or successively higher) authority" in the context of Title VII, the fifth element of *Jones* must be satisfied for Taylor to establish her hostile work environment claim.

Regarding Taylor's claim that Seton knew of Butler's harassing behavior and took no action to cause it to stop, neither party contends that Seton was unaware of Butler's alleged harassment; rather, the parties disagree as to whether Seton took prompt and appropriate remedial action, reasonably calculated to end the harassment. Asserting that it took sufficient action, Seton points out that the Fifth Circuit has held that in many hostile work environment cases, in determining whether the employer's actions were sufficiently remedial, the Court considers whether the offending

behavior ceased. *Skidmore v. Precision Printing & Pckg. Inc.*, 188 F.3d 606, 616 (5th Cir. 1999) (listing cases). In *Skidmore* the plaintiff failed to establish the fifth element of her hostile work environment claim because the employer instructed the alleged harasser to stop, moved him to a different shift, and the harassment ceased. *Id.* Seton contends this is substantially similar to the actions taken in regard to Taylor's complaints.

Taylor first complained in June 2008. She concedes Butler ceased engaging in the alleged harassment for some time after this complaint. However, the fact that the harassment subsided for some time does not necessarily imply that Seton took any remedial action. Taylor argues that no one at Seton said anything to Butler after her June 2008 complaint and that Seton conducted no investigation. (Pl. Resp. In Opp. To D. Mot. for Sum. J. at 30-31). H. Nguyen stated that she went to Butler and informed him that the manner in which he was touching Taylor was making Taylor uncomfortable and could make others uncomfortable and that he should remain courteous to Taylor. (H. Nguyen Aff. ¶10). Butler testified he was uncertain as to whether he was counseled in June 2008. (Butler Depo. at 9:17-11:6).

Regarding Taylor's later complaints, Seton points to the evidence that, after Taylor's February 22, 2009 complaint, it counseled Butler and scheduled his shifts to minimize interactions with Taylor, and, after the April 2, 2009 complaint, Seton undertook an investigation and began the process of transferring Butler to another facility. Taylor responds that Seton did no investigation into Taylor's February 22, 2009 complaint until April 6, 2009, and, when Butler was disciplined on March 6, 2009, he was cited merely for "discourtesy to employees or patients" and not for a violation of Seton's sexual harassment policy. (Pl. Resp. In Opp. To D. Mot. for Sum. J. at 30-31). She further claims that when Seton learned the full extent of Butler's harassment of all three Plaintiffs,

it took no further action to counsel or discipline Butler. (*Id.*). She also points out that Seton HR and upper level management assisted Butler in transferring to another facility and actively took steps to conceal the harassment allegations. (*Id.*). Further, Taylor testified that Butler's harassment continued throughout this period.

Thus, this case is not comparable to *Skidmore* where the harassment ceased after the employer's remedial actions. And, given Taylor's proffered facts concerning Seton's favorable treatment of Butler as well as the disputed facts regarding Seton's remedial actions, a reasonable jury could find that Seton's remedial steps were not reasonably calculated to stop the harassment. Viewing the evidence in the light most favorable to the non-movant, Seton has failed to demonstrate that there is no genuine issue as to any material fact regarding Taylor's hostile work environment claim. Accordingly, summary judgment should not be granted with regard to this claim.

### 2. J. Nguyen's Hostile Work Environment Claim

Seton contends the alleged physical contact between Butler and J. Nguyen is less severe than the contact plaintiffs claimed in *Hockman* and *Shepherd*. As in Taylor's case, the combined severity and pervasiveness of Butler's alleged harassment of J. Nguyen surpasses the totality of the circumstances in *Hockman* and *Shepherd*. J. Nguyen testified that from summer of 2008 to spring of 2009 Butler regularly touched and spoke to her in an inappropriate manner. Butler said sexual things toward her, rubbed himself in front of her, grabbed her waist, and rubbed her shoulders. (J. Nguyen Depo. at 116:2-5). In both 2008 and 2009, he intentionally touched her breasts by coming up behind her and wrapping his arms around her chest, and touched her rear end by "coming up behind [her] and either rubbing off of [her] or grabbing behind [her]." (*Id.* at 158:11-159:4; 161:7-16). Butler smelled and touched her hair numerous times, including pulling on her ponytail

numerous times, sometimes causing her pain. (*Id.* at 111:13-18; 112:2-6; 153:14-22). J. Nguyen became physically ill at the sight of Butler such that she experienced "nausea, vomiting, anxiety, depression, not wanting to be there, not wanting to work." (*Id.* at 154:24-155:13).

As already noted with regard to Taylor, what makes this case stand out is the sheer pervasiveness of Butler's conduct. J. Nguyen testified that Butler's actions were repeated countless times. The court recognizes that Butler denies much of what is alleged to have occurred, but a jury must resolve those differences. At this stage, the Court must view the evidence in the light most favorable to the Plaintiffs. Viewing the evidence in that light, Butler's actions were disturbingly creepy, and plainly offensive, and they persisted throughout the time that Nguyen worked with Butler. The combination of severity and pervasiveness in this case surpasses the facts in both *Hockman* and *Shepherd*. As with Taylor, the facts are sufficient to establish the fourth element of a hostile environment claim.

With regard to the fifth element of this claim, J. Nguyen makes the same arguments as Taylor (Butler was a supervisor and Seton knew about Butler's harassment and took no action to cause it to stop). The Court has already rejected the first of these arguments, and will therefore limit its discussion here to the second. Regarding the claim that Seton knew about the harassment of J. Nguyen and took no action to stop it, Seton argues that, as in *Skidmore*, the allegedly harassing conduct ceased after she made her complaint.

The undisputed evidence demonstrates that Seton had actual knowledge of J. Nguyen's allegations of harassment as early as February 22, 2009, when Taylor emailed H. Nguyen stating that "Jennifer Nguyen was asking me some questions on Friday in the Tele room and he came in and took a piece of her hair in his hand and leaned over and smelled it." (Ev. in Supp. of Pl. Res. in Opp. to

32

Def. Mot. for Sum. J., Ex. 18 at 2). Seton issued a disciplinary writeup to Butler about two weeks later, on March 6, 2009. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 19). J. Nguyen herself did not mention any harassment to Seton until April 6, 2009, when she stated in her interview with H. Nguyen that Butler had not harassed her since at least a month before—about the time of Butler's disciplinary writeup. (J. Nguyen Depo. at 34:16-35:12). And after the complaint she had little to no interaction with Butler because she actively avoided him and H. Nguyen minimized their interactions by intentionally scheduling them apart. (*Id.* at 199:11-17, 200:20-201:7; H. Nguyen Aff. ¶ 7).

As pointed out in *Skidmore*, the Fifth Circuit has often found an employer's response to be prompt remedial action as a matter of law where the offending behavior has ceased after the response. Here, about two weeks after being made aware of harassment against J. Nguyen, Butler was disciplined and from that point forward J. Nguyen experienced no further harassment due, at least in part, to Seton's actions. As a result, summary judgment should be granted with regard to this claim.

### 3.     Cooper's Hostile Work Environment Claim

With regard to Cooper, Seton again challenged the fourth and fifth elements of her hostile work environment claim. Cooper testified that from the beginning of her employment in late January or early February 2009, to her transfer to the night shift in late March or early April, Butler regularly put his hand or arm on her shoulders; once put his hand around her waist and pulled her into a supply closet; and once put his arms around her arms and chest from behind while in the supply closet. (Cooper Depo. at 48:25-49:4, 45:1-9; 149:15-22, 46:22-47:2, 153:3-7). She testified that Butler also made sexually suggestive comments to her during the supply closet incidents. (*Id.* at 45:24-46:1,

47:13-20). She testified that Butler continued to touch or shake her despite her requests to stop (*Id.*). In sum, Cooper had contact with Butler for a brief period of about two months before she transferred to the night shift. During these two months she experienced regular touching, along with the two incidents in the supply closet.

While certainly unpleasant (again, the term "creepy" comes to mind), these facts do not reach the severity and pervasiveness threshold of cases in which the Fifth Circuit has found a hostile environment to exist. Cooper cites *Taylor-Rogers v. Robb & Stucky, Ltd.*, 82 Fed. Appx. 974, 975 (5th Cir.2003) as an example of a comparable case where summary judgment was inappropriate. (Pl. Res. in Opp. to Def. Mot. for Sum. J at 25-26). In *Taylor-Roger*s, the Fifth Circuit reversed summary judgment for the defendant, finding there was sufficient evidence to create a fact issue as to the severity and pervasiveness of the harassment, where the plaintiff complained that a co-employee "(1) rubbed up on her on a daily basis, (2) simulated a sex act with her, (3) made sexually suggestive comments to her, (4) touched her, and (5) unbuttoned her blouse and touched her breast underneath her bra" over the course of six months. *Id.* Plaintiffs only mention the first four allegations in *Taylor-Rogers*, which are similar to those in the present case; however, the severity of unbuttoning a blouse and touching a breast under a bra clearly exceeds the severity of any touching in the present case.

Additionally, Cooper cites *McKinnis v. Crescent Guardian, Inc.*, 189 Fed.Appx. 307, 308 (5th Cir.2006), where the Fifth Circuit reversed summary judgment based on allegations that plaintiff's co-worker regularly asked for hugs and kisses and touched her, including one incident in which he touched her breast and another in which he touched her thigh. The Court agreed with the Seventh Circuit that "the deliberate and unwanted touching of [a plaintiff's] intimate body parts can

constitute severe sexual harassment." *Id.* at 310 (quoting *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir.2001)) (alteration in original).  Here, Cooper does not allege any deliberate and unwanted touching of her intimate body parts.  Indeed, the conduct here does not even reach the severity of regularly asking for hugs and kisses.

Moreover, it would appear that Cooper's claims do not even reach the severity and pervasiveness levels found in *Hockman* and *Shepherd*.  In *Hockman* the offender slapped Hockman on the behind, grabbed Hockman's breasts and behind, and held Hockman's cheeks and tried to kiss her.  *Hockman*, 407 F.3d at 328.  And Butler's regular touching of Cooper's shoulder is less severe than the regular touching in *Shepherd*, where the plaintiff's coworker regularly rubbed one of his hands from her shoulder down to her wrist over the course of two years.  *Shepherd*, 168 F.3d at 872. Similarly, Butler's (down-right weird) statements concerning hurting Cooper do not exceed the severity of the statements made in *Shepherd* regarding plaintiff's nipples, the size of her thighs, and her sitting in her coworker's lap. Summary judgment is therefore appropriate on this claim.

**B.      Plaintiffs' Retaliation Claims**

In a Title VII retaliation case, the plaintiff must first make a *prima facie* that: (1) she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action.  *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).  In the context of retaliation, an adverse employment action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The standard for determining whether the injury or harm constitutes retaliation will depend on the particular circumstances of the case. *Burlington Northern*,

548 U.S. at 69. When a plaintiff makes a *prima facie* case, the burden shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the adverse employment action. *Gee*, 289 F.3d at 345. If the defendant is able to demonstrate such a purpose, the burden shifts back to the plaintiff to prove that the employer's stated purpose for the adverse action was merely a pretext for the real, retaliatory purpose. *Id.* To satisfy this burden, the plaintiff must offer "some evidence, whether direct or circumstantial, that permits the jury to infer that the proffered explanation was a pretext for [retaliation]. The trier of fact may not simply choose to disbelieve the employer's explanation." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1185 (5th Cir. 1997). The Fifth Circuit has held that in retaliation cases under either Title VII or the TCHRA, when the defendant has proven a nondiscriminatory purpose for its actions, the plaintiff must prove that "but for" the discriminatory purpose, she would not have been terminated. *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487-89 (5th Cir. 2004).

### 1. Taylor's Retaliation Claims

Taylor alleges Seton retaliated against by changing her assignments such that she had to do work she was medically restricted from performing, by reducing her work schedule, by disciplining her for behavior that other Clinical Assistants did not get disciplined for, and by criticizing her for complaining of sexual harassment. (Compl. ¶ 19). She asserts that this pattern of conduct constituted constructive termination because the badgering, harassment and humiliation were calculated to lead to her resignation. (Pl. Res. In Opp. To Def. Mot. For Sum. J. at 38).

### a. Changed floor assignment, reduced working hours, and criticism

Regarding a *prima facie* showing of retaliation in the form of changed floor assignments and reduced working hours, Seton asserts that there is no evidence in the record that these adverse

employment actions occurred. Taylor's floor assignment was only changed for one shift on one day because of a medical restriction imposed by Taylor's physician. (Def. Mot. for Sum. J. at 13-14). Taylor's scheduled hours were reduced due to Seton hiring additional clinical assistants, and Taylor was scheduled for at least the 36 hours per week she was originally hired to work. (*Id.* at 15). Taylor does not present any contrary argument.[8] She thus fails to make a prima facie showing that these actions constitute adverse employment actions in the context of her retaliation claim, and summary judgment should be granted on these claims.

### b. Disciplinary actions

Taylor next asserts that the disciplinary writeups she received were retaliatory, and constitute adverse employment actions under Title VII . Seton contends Taylor cannot establish a causal link between her complaints and disciplinary writeups.

The Fifth Circuit has held that "the combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). The Supreme Court has held temporal proximity must be very close in cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-274 (2001). Specifically, a three or four month gap between the protected activity and the adverse action is insufficient. *Id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). In this case

---

[8]Taylor also does not pursue her initial claim that Seton retaliated against her by criticizing her complaints of sexual harassment. She instead focuses on the disciplinary writeups.

Taylor made her second complaint on February 22, 2009. Five weeks later on April 1, 2009, Taylor received her second disciplinary writeup. This is significantly shorter than the three and four month periods just noted. Taylor also points out that Seton treated Butler considerably more favorably than her. Based on this evidence, Taylor has established a prima facie case of retaliation.

Seton responds that the legitimate nondiscriminatory purpose is apparent on the face of the disciplinary writeup, which was issued for using "inappropriate, unprofessional, or crude language in responding to a question from a new staff member." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 29). Specifically, a coworker reported that Taylor used the word "fuck" in an angry exclamation to a new clinical assistant who, on his first day of work, asked Taylor whether she had completed a patient's bath. (H. Nguyen Aff. ¶16). Thus, the burden shifts back to Taylor to prove that Seton's stated reason for the adverse action was merely a pretext. Taylor contends that the weakness and implausibility of Seton's alleged purpose is shown by: (1) the temporal proximity between the complaints and disciplinary writeups; (2) the writeups were based on hearsay from other employees and not substantiated by any documentation; (3) receiving a disciplinary writeup for saying a curse word on the floor is inconsistent with Seton's (and specifically H. Nguyen's) policy of giving an undocumented oral discipline to employees on their first "discourtesy" event; (4) H. Nguyen and Thor demonstrated a pattern of looking for things to write up Taylor for; and (5) Seton's favorable treatment of Butler.

Of these, the most compelling argument is Seton's treatment of Butler compared to Taylor. Taylor points out that H. Nguyen and Thor did little or no investigation into the harassment allegations against Butler for ten months after the first report, and after the second report, only disciplined Butler for "discourtesy" at the lightest level of discipline. (Pl. Res. in Opp. to Def. Mot.

for Sum. J. at 35). She further asserts that, when Seton discovered other employees had witnessed or been subjected to similar treatment by Butler, Seton facilitated a transfer for him rather than disciplining him. (*Id.*). Taylor also points out Thor's email, in which Thor agrees that Thor, Melanie Fox, and H. Nguyen should all meet with Taylor so that Taylor cannot make false statements regarding Thor and H. Nguyen. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 37 at 2). Taylor states that Thor's email demonstrates Seton sought unwarranted disciplinary actions against Taylor since there is no evidence she had made false statements.

Viewed in its totality and construed in the light most favorable to Taylor, this evidence is sufficient to create a genuine issue of material fact as to whether Seton issued disciplinary writeups in retaliation for Taylor's sexual harassment complaints. Considering the temporal proximity between the disciplinary writeup and Taylor's complaint, as well as the evidence of disparate disciplinary treatment between Butler and plaintiffs, a reasonable jury could find Seton's proffered explanation for discipline was a pretext for illegal discrimination. Thus, summary judgment should not be granted regarding this claim.

### c. Constructive Discharge

Finally, Taylor contends that Seton's retaliatory actions amounted to constructive discharge. Taylor alleges that Seton's unsupported disciplinary notices, failure to address her complaints of harassment, and continuous search for potential disciplinary issues for Taylor constitute badgering, harassment and humiliation calculated to lead to Taylor's resignation. Taylor points to the formal written disciplinary notices she received, as well as evidence that H. Nguyen and Thor sought out reasons to discipline her.

To prove constructive discharge as an adverse employment action, a party must show that "a reasonable party in his shoes would have felt compelled to resign." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (quoting *Landgraf v. USI Film Products*, 968 F.2d 427, 429 (5th Cir. 1992)). To determine if a reasonable employee would feel compelled to resign, courts consider the relevancy of the following events: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

Taylor does not allege demotion, reduction in salary, reduction in job responsibilities, reassignment, or an offer for early retirement. Rather, she claims that Seton badgered, harassed and humiliated her in a manner calculated to encourage her resignation. Courts have "found no authority nor has any been provided in which the single factor of 'badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation' resulted in a finding of constructive discharge." *Ginn v. Tex. Wired Music, Inc.,* 2000 WL 33348246, at *15 (W.D. Tex Aug. 10, 2000); *see also Garza v. Fuston*, 2003 WL 22255698, at *4 (N.D. Tex. Sept. 29, 2003) (not clear that this factor alone can support a claim of constructive discharge). In *Ginn*, the Court granted summary judgment against the Plaintiff even though she charged her employer with "calling her stupid, sarcastically taunting her . . . threatening her with termination, and taking several actions in reference to her absence . . . he knew were not consistent with, required by, or even allowed by company policy." *Ginn*, 2000 WL 33348246, at *15. This is certainly more severe than the formal

disciplinary notices Taylor received. Given the case law on whether these allegations can give rise to a constructive discharge claim, and because the facts are less serious than in other cases where summary judgment has been granted, summary judgment should be granted regarding this claim.

### 2. J. Nguyen's Retaliation Claims

J. Nguyen alleges Seton retaliated against her for filing an EEOC Charge against Seton. She asserts that Seton issued her unwarranted discipline and threats of discipline, denied her raises, and refused to abide by her physician's restrictions. (Compl. ¶ 27). She was terminated and asserts the reason given for her termination was a pretext for gender discrimination and retaliation. (*Id.* ¶ 28).

### a. Threats of discipline, denial of raises, and refusal to abide by physician's restrictions

Regarding a prima facie showing of retaliation in the form of threats of discipline, denial of raises, and refusal to abide by J. Nguyen's physician's restrictions, Seton asserts that there is no evidence in the record that these adverse employment actions occurred. Seton points out that the record establishes that Seton granted J. Nguyen's requests for time off when she indicated they were medically required and that Seton excused absences when she provided physician notes indicating they were due to medical reasons. (*Id.* at 6). They also point out that J. Nguyen received a pay raise and a promotion with pay raise even after her EEOC complaint. (*Id.* at 5). Plaintiff does not respond to these arguments.[9] Accordingly, summary judgment should be granted regarding these claims.

### b. Disciplinary actions

J. Nguyen also asserts that the disciplinary writeups she received were acts of retaliation, based upon their temporal proximity to her sexual harassment complaints and Seton's more

---

[9]Nguyen also does not pursue her initial claim that Seton retaliated against her by threatening to discipline her.

favorable treatment of Butler. Seton contends that J. Nguyen cannot establish a causal link between her complaints and the disciplinary writeups.

J. Nguyen made her EEOC Charge on May 26, 2009. J. Nguyen received disciplinary writeups a week later, on June 3, and four weeks later, on June 22, 2009. This close temporal proximity between the writeups and the EEOC charge, as well as the evidence of Seton's favorable treatment of Butler, is sufficient to create a triable issue on J. Nguyen's *prima facie* case of retaliation. Seton responds, as it did with regard to Taylor, that a legitimate nondiscriminatory purpose is apparent on the face of the disciplinary writeups. The June 3 writeup states that J. Nguyen "called the charge nurse at 5:30 AM to ask if she was going to be cancelled for the shift. The charge nurse told Jennifer no and that the floor was busy and she needed to come in to work as scheduled. At 5:45 AM Jennifer called in ill." (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 25). This is considered a late call-in because the appropriate call-in time for any shift is 3 hours prior to when the shift starts. (*Id.*). The June 22 writeup cites J. Nguyen for three unscheduled absences in a three-month period. (Pl. Ex. 26).

Nguyen responds that Seton's claimed justification for the writeups is undermined by: (1) the temporal proximity between the complaints and disciplinary writeups; (2) the writeups are based on hearsay from other employees and not substantiated by any documentation; and (3) Seton's favorable treatment of Butler. As discussed above, a reasonable jury could find Seton's reasons for disciplinary actions were pretextual based on Plaintiffs' evidence of disparate disciplinary treatment of Butler and Plaintiffs. Viewed in its totality and construed in the light most favorable of the non-movant, the summary judgment evidence is sufficient to create a genuine issue of material fact as

to whether Seton issued disciplinary writeups in retaliation for J. Nguyen's EEOC Charge. Accordingly, summary judgment should not be granted regarding this claim.

### c. Termination

Regarding her termination, Nguyen asserts a causal link between her EEOC Charge and her termination based upon the fact that she was terminated for actions she was not asked or permitted to explain; that there was no evidence that she had committed the infraction; and that she was permitted to work from the time of the incident to the time of her termination without any additional supervision, indicating Seton did not think her behavior constituted a continuing danger. Seton responds it terminated J. Nguyen for charting vital signs that she had not taken. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 28). The disciplinary report states that vital signs for two patients were charted by J. Nguyen at 15:30 and 15:37 but neither of the monitors for these patients showed vital signs were recorded at those times. (*Id.*). One of the patients who was alert and oriented stated no one took her vital signs at or around that time. (*Id.*). J. Nguyen responds that she was not given any opportunity to respond to this charge. (Ev. in Supp. of Pl. Res. in Opp. to Def. Mot. for Sum. J., Ex. 40). She points out that there is no policy at Seton that patient vital signs must be recorded on the monitors in the patients' rooms. (*Id.*). She further states there are any number of means by which to take vital signs that are not recorded on the computer and she frequently used such means on patients, such as manually taking vital signs and entering the information into the COMPASS system rather than using the monitors. (*Id.*). J. Nguyen also argues that the fact that Seton permitted her to work from the time of the incident to the time of her termination without any additional supervision belies Seton's claim it was concerned about her endangering the lives of its patients by falsifying records.

Once again, the facts are disputed on this point. Viewing the summary judgment evidence in the light most favorable to J. Nguyen, Seton's favoritism of Butler over Plaintiffs (see above regarding evidence of Seton assisting Butler's transfer) and Seton's questionable rationale for her termination could enable a reasonable jury to conclude there was a "but for" causal connection between J. Nguyen's EEOC charge and her termination. Accordingly, summary judgment should not be granted regarding this claim.

### 3. Cooper's Constructive Discharge Claim

Cooper agrees she was not constructively discharged by Seton and is unopposed to the Court granting Seton's Motion for Summary Judgment regarding her constructive discharge claim. (Pl. Resp. in Opp. to Def. Mot. for Sum. J. at 19, fn 4).[10] Accordingly, summary judgment should be denied on this claim.

### C. Seton's Common Law Liability for Butler's Alleged Assault

The Texas Supreme Court has held that the TCHRA is the exclusive remedy for workplace sexual harassment and preempts common law claims of assault against employers where the claims are predicated on the same conduct underlying a TCHRA claim. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 803 (Tex. 2010) ("employer liability for unwanted sexual touching by a coworker (simple assault under Texas law given its 'offensive or provocative' nature) is limited to the TCHRA scheme that specifically covers employer liability for sexual harassment"). Here, as in *Waffle*

---

[10]Additionally, although Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment states that all plaintiffs were subjected to a series of retaliatory disciplinary actions, there is no reference to evidence of retaliatory conduct against Cooper. (Pl. Resp. in Opp. to Def. Mot. for Sum. J. at 32). Thus, the summary judgment evidence is insufficient to create a genuine issue of material fact as to whether Seton retaliated against Cooper for her EEOC Charge.

*House*, the Plaintiffs' assault claims are predicated on the same conduct that underlies their TCHRA claims. The Court in *Waffle House* held:

> [s]exual harassment as a legal claim is a statutory creation of legislators, not a common-law creation of judges. As [plaintiff's] tort claim is grounded on sexual harassment, it would impose liability for failing to prevent a harm not cognizable under Texas common law. Further, recognizing a common-law cause of action in this context would negate the Legislature's carefully balanced and detailed statutory regime applicable to sexual-harassment claims, and effectively repeal the TCHRA in sexual-harassment cases where physical contact occurs.

*Id.* at 811-812.

Both parties agree that the common law claims against Seton are barred under *Waffle House*. (Clerk's Dkt. #33 and #34). Defendants however, make the novel argument that, if the Court finds that Plaintiffs had failed to make out a sexual harassment claim under the TCHRA (as is the case with Cooper), then their common law claims should be permitted to go forward. This misinterprets *Waffle House*. In *Waffle House*, the Texas Supreme Court held that, if common law and statutory claims based on the same underlying sexual-harassment facts are allowed to coexist:

> the panoply of special rules applicable to TCHRA claims could be circumvented in any case where the alleged sexual harassment included even the slightest physical contact. In any such case, the plaintiff could claim that a physical contact, even if not actionable as statutory sexual harassment, and even if not normally actionable as a common-law battery, was 'offensive or provocative' because it occurred in the context and course of the coworker's sexual harassment of the plaintiff.

*Id.* at 807. This speaks directly to Plaintiffs' theory. If Plaintiffs are permitted to pursue their common law claims against Seton simply because they failed to meet the requirements of a TCHRA claim based on the same gravamen, they would be permitted to circumvent the TCHRA's unique standards and procedures, including the statutory requirements of exhaustion of administrative remedies, the relatively short statute of limitations, the limits on compensatory and punitive damages, and the requirement that the plaintiff prove an abusive working environment. *Id.* at 807.

45

The Texas Supreme Court rejected this very result in *Waffle House,* stating that "[w]here the gravamen of a plaintiff's case is TCHRA-covered harassment, the Act forecloses common-law theories predicated on the same underlying sexual-harassment facts." *Id.* at 813. Thus, Plaintiff's common law claims against Seton for Butler's assault based on theories of respondeat superior, ratification, and negligence all fail.

## IV. RECOMMENDATION

The undersigned thus **RECOMMENDS** that the District Court **GRANT** Defendant Seton Motion for Summary Judgment Against Plaintiff Elizabeth Cooper (Clerk's Dkt. #24); **GRANT IN PART** Defendant Seton Healthcare's Motion for Summary Judgment Against Plaintiff Jennifer Nguyen (Clerk's Dkt. #25) as described above; **GRANT IN PART** Defendant Seton Healthcare's Motion for Summary Judgment Against Plaintiff Josie Taylor (Clerk's Dkt. #26) as described above; and **DENY** Defendant John Butler's Motion for Summary Judgment (Clerk's Dkt. #27).

## V. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 U.S. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 3rd day of January, 2012.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE